904 F.2d 1081
 58 USLW 2730
 Darlene MILLER and JR's Kitty Kat Lounge, Inc., an Indiana
Corporation; and Glen Theatre, Inc., an Indiana
Corporation, Gayle Sutro, and Carla
Johnson, Plaintiffs-Appellants,
v.
CIVIL CITY OF SOUTH BEND, et al., Defendants-Appellees.
 Nos. 88-3006, 88-3244.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 25, 1989.
Reargued En Banc Jan. 31, 1990.
Decided May 24, 1990.
As Amended May 24, 1990.
 
 Charles A. Asher, South Bend, Ind. and Lee J. Klein, Durand, Mich., for plaintiffs-appellants.
 William E. Daily, Asst. Atty. Gen., Arthur T. Perry, Wayne E. Uhl, Deputy Attys. Gen., Office of the Atty. Gen., Indianapolis, Ind., and Robert C. Rosenfeld, South Bend, Ind., for defendants-appellees.
 Before BAUER, Chief Judge, CUMMINGS, WOOD, Jr., CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION and KANNE, Circuit Judges.
 FLAUM, Circuit Judge, joined by BAUER, Chief Judge, CUMMINGS, HARLINGTON WOOD, Jr., CUDAHY, POSNER and RIPPLE, Circuit Judges.
 
 
 1
 In this case we are asked to reconsider our unanimous decision in Miller v. Civil City of South Bend, 887 F.2d 826 (7th Cir.1989) in which we held that Indiana's Public Indecency statute, IND.CODE 35-45-4-1, was unconstitutional as applied because non-obscene barroom variety nude dancing performed as entertainment is expression and, as such, is entitled to limited protection under the first amendment. That opinion was subsequently vacated based on a majority vote by the judges of this Court and we reheard oral argument en banc on January 31, 1990.
 
 
 2
 The extensive substantive and procedural history of this case is adequately discussed in our vacated opinion and we need not repeat ourselves here. See Miller, 887 F.2d at 829. The underlying facts of this matter are uncontested. Plaintiff J.R.'s Kitty Kat Lounge is a drinking establishment located in the City of South Bend that prior to the enactment of the ordinance in question provided nude dancing as entertainment for their patrons. Plaintiff Glen Theatre, an establishment which does not serve alcoholic beverages, similarly provided nude dancing as entertainment. Plaintiffs Darlene Miller, Gayle Sutro and Carla Johnson are dancers who wish to engage in such activity. The plaintiffs, in two separate actions that were consolidated on appeal, filed suits in the district court to enjoin the State of Indiana from enforcing its public indecency law to prevent them from presenting nude and semi-nude barroom dancing. The statute, IND.CODE 35-45-4-1, on its face provides for a total ban on nudity in public places. Violation of the statute is a Class A Misdemeanor. It broadly defines nudity as "the showing of the human male or female genitals, pubic area, or buttocks with less than opaque covering, the showing of the female breast with less than a fully opaque covering of any part of the nipple, or the showing of covered male genitals in a discernibly turgid state."[1] Obviously, the activity the plaintiffs seek to engage in falls within this definition.
 
 
 3
 We stress from the outset the limited scope of our inquiry today. This case does not concern obscenity, as the State has conceded that the dancing involved is non-obscene. It also does not concern whether these establishments are "public places" under the statute; the plaintiffs acknowledge that they are. See State v. Baysinger, 272 Ind. 236, 397 N.E.2d 580, 583 (1980). And we are not concerned with any alleged overbreadth problems; that issue has already been resolved by this Court. See Glen Theatre v. Pearson, 802 F.2d 287 (7th Cir.1987). Rather, the issue presented for this Court is a narrow one: whether non-obscene nude dancing of the barroom variety, performed as entertainment, is expression and thus entitled to protection under the first amendment.[2] Our analysis of the first amendment, based upon Supreme Court teachings and prior lower federal court decisions, directs us to the conclusion that such expression is entitled to limited protection and thus the statute is unconstitutional as applied.
 
 I.
 
 4
 In addressing the issue before us, we recognize that we are not writing on a clean slate. While yet to delineate the precise scope of the protection afforded nude dancing, the Supreme Court, along with several circuit and district courts, has repeatedly and consistently intimated that nude dancing performed as entertainment is protected activity under the first amendment. The Court first addressed the issue of first amendment protections for adult entertainment in California v. LaRue, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), where local bar owners sought a declaratory judgment that regulations promulgated by California's Department of Alcohol Beverage Control regulating the type of entertainment that could be presented in nightclubs or bars were unconstitutional because they abridged the freedom of expression guaranteed by the first and fourteenth amendments. The regulations in question "provided that liquor by the drink shall not be served in places where certain grossly sexual exhibitions are performed." Id. at 119, 93 S.Ct. at 397 (Stewart, J., concurring). Reviewing the legislative history, the Court observed that the regulations were aimed at "bacchanalian revelries" that went far beyond simple nude dancing and entered the realm of obscenity. Overturning the district court's grant of the declaratory judgment, the Court held that the State was empowered under the twenty-first amendment to regulate such entertainment in establishments that serve liquor. In so holding, the Court recognized that "some of the performances to which these regulations address themselves are within the limits of the constitutional protection of freedom of expression ..." Id. at 118, 93 S.Ct. at 397. The Court was unanimous in agreement regarding this principle. The dissent by Justice Brennan found that the regulation "clearly applies to some speech protected by the First Amendment ..." Id. at 123, 93 S.Ct. at 399 (Brennan, J., dissenting). In a separate dissent, Justice Marshall noted evidence that the regulations may have been enacted for the "specific purpose of evading" the standards imposed on obscenity laws and that "the Government may suppress expression treating with sex only if it meets the three-pronged Roth-Memoirs [obscenity] test." Id. at 139, 93 S.Ct. at 408 (Marshall, J., dissenting).
 
 
 5
 In the next case before the Court involving nude dancing, the justices strengthened their apparent recognition that the activity may be protected expression. In Doran v. Salem Inn, owners of three topless bars sought a temporary injunction against a Northhampton, New York, town ordinance which prohibited topless dancing in "[a]ny public place." 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1974). The Court, per Justice Rehnquist, declared that "[a]lthough the customary 'barroom' type of nude dancing may involve only the barest minimum of protected expression, we recognized [in LaRue ] that this form of entertainment might be entitled to First and Fourteenth Amendment protection in some circumstances." Id. at 932, 95 S.Ct. at 2568. The Court upheld the grant of a preliminary injunction on the grounds that, unlike the ordinance in LaRue, the ordinance was overbroad because it applied to all commercial establishments and thus was not justifiable under the twenty-first amendment.
 
 
 6
 The Court reached differing conclusions in LaRue and Doran concerning statutes regulating adult entertainment. In doing so, it drew a distinction between an establishment which serves alcohol and one which does not. The ordinance in LaRue was upheld because it was within the confines of the state's power under the twenty-first amendment whereas the ordinance in Doran was not. These two cases can be reconciled only on the implicit assumption that the regulated activity, topless dancing, was protected by the first amendment. Otherwise, the state's police power would be sufficient to support the statutes in both cases. This implicit assumption was made explicit in the Court's next encounter with nude dancing, Schad v. Mt. Ephraim, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981).
 
 
 7
 In Schad, the Court addressed a city zoning ordinance that prohibited all live entertainment. The defendants, operators of an adult bookstore, were convicted of violating the ordinance by offering to its customers the opportunity to view a live nude dancer. The Court overturned the convictions finding that the ordinance, by restricting all forms of live entertainment, was overbroad and thus violative of the first and fourteenth amendments.
 
 
 8
 The Court began its analysis by discussing the scope of the broadly drafted city ordinance: "Here the Borough totally excludes all live entertainment, including non-obscene nude dancing that is otherwise protected by the First Amendment." Id. at 68, 101 S.Ct. at 2182. From this starting point, the Court went on to discuss the protections afforded nude dancing under the first amendment. It noted that "[n]udity alone does not place otherwise protected material outside the mantle of the first amendment." Schad, 452 U.S. at 66, 101 S.Ct. at 2181 (citation omitted). The Court went on to state that "[n]or may an entertainment program be prohibited solely because it displays the nude human figure ..." Based on these principles the Court concluded "nude dancing is not without its First Amendment protections from official regulations." Id. (citations omitted) (emphasis added). The Court, while finding it unnecessary to define precisely the scope of the protection afforded the activity, unmistakably recognized that in some circumstances it falls within the ambit of the first amendment.
 
 
 9
 The majority's position on nude dancing in Schad was accepted by the entire Court. Chief Justice Burger, joined by Justice Rehnquist, dissented on the overbreadth issue but accepted the majority's view on nude dancing. The Chief Justice concluded that "the fact that a form of expression [nude dancing] enjoys some constitutional protection does not mean that there are not times and places inappropriate for its exercise." Id. at 86, 101 S.Ct. at 2191 (Burger, C.J., dissenting). Justice Stevens, in a concurring opinion, recognized that "the foliage of the First Amendment may cast protective shadows over some forms of nude dancing ..." Id. at 80, 101 S.Ct. at 2188. As a result of the Court's agreement on this issue, Schad has generally and continually been recognized by lower courts for the proposition that nude dancing is protected expression.
 
 
 10
 In the Court's post-Schad decisions it has consistently re-affirmed its position in Schad that nude dancing performed as entertainment falls within the scope of the first amendment. In Young v. Arkansas, 474 U.S. 1070, 106 S.Ct. 830, 88 L.Ed.2d 801 (1985), Justice White, joined by Justice Brennan in dissenting from denial of certiorari, recognized the Court's "repeated indications that barroom nude dancing is a type of expression that is protected under the First Amendment" and urged an explicit holding regarding the scope of that protection. In addition, in Massachusetts v. Oakes, --- U.S. ----, 109 S.Ct. 2633, 2642, 105 L.Ed.2d 493 (1989), Justice Brennan, in a dissent joined by Justices Marshall and Stevens, declared that Schad affords nude dancing protection under the first amendment, and that modeling, like nude dancing, "enjoys like shelter under the First Amendment." See also Sable Communications v. FCC, --- U.S. ----, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989) ("[s]exual expression which is indecent but not obscene is protected by the First Amendment"); New York State Liquor Auth. v. Bellanca, 452 U.S. 714, 719, 101 S.Ct. 2599, 2602, 69 L.Ed.2d 357 (1980) (Stevens, J., dissenting) (stating that in LaRue the Court recognized "the protected expression implicated by nude dancing"). Most recently, in FW/PBS, d/b/a Paris Adult Bookstore II v. City of Dallas, --- U.S. ----, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), the Court addressed a challenge to an ordinance enacted by the City of Dallas regulating "sexually oriented businesses" through a scheme incorporating zoning, licenses, and inspections. Various adult establishments, including several providing live nude dancing, sued for declaratory relief and a temporary as well as a permanent injunction. Six justices agreed that the ordinance violated the first amendment by establishing a licensing scheme without adequate procedural safeguards as required by Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), but they split into two camps as to what safeguards are required in this context. Justice O'Connor, writing for the three-member plurality, began her analysis by noting that
 
 
 11
 [a]lthough the ordinance applies to some businesses that apparently are not protected by the First Amendment, e.g., escort agencies and sexual encounter centers, it largely targets businesses purveying sexually explicit speech which the city concedes for purposes of these cases are protected by the First Amendment. Cf. Smith v. California, 361 U.S. 147, 150 [80 S.Ct. 215, 217, 4 L.Ed.2d 205] (1959) (bookstores); Southeastern Promotions, Ltd. v. Conrad, supra [420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) ] (live theater performances); Young v. Mini Theaters, Inc., 427 U.S. 50 [96 S.Ct. 2440, 49 L.Ed.2d 310] (1976) (motion picture theaters); Schad v. Mount Ephraim, 452 U.S. 61 [101 S.Ct. 2176, 68 L.Ed.2d 671] (1981) (nude dancing).
 
 
 12
 Paris Adult Book Stores II, 110 S.Ct. at 604 (emphasis added). The plurality then concluded that "the businesses challenging the scheme have a valid First Amendment interest." This recognition that the first amendment affords nude dancing some protection is implicit throughout the plurality opinion. With the exception of Justice Scalia in dissent, no other justice took issue with the plurality's position on nude dancing.
 
 II.
 
 13
 From this reading of Supreme Court precedent,[3] we are constrained to hold today that, as a matter of law, non-obscene nude dancing performed as entertainment is expression and as such is entitled to limited protection under the first amendment. In reaching this conclusion, we are well aware that the distinction between conduct and expression is an elusive one.[4] While clearly not all conduct is expression, dance as entertainment is a form of conduct that is inherently expressive.
 
 
 14
 We begin with a brief examination of the mode of expression involved. Dance as entertainment is one of the earliest forms of expression known to man. Its written history goes back at least as far as fifth century classical Greece, where Euripides described the frenzied fertility dance in his drama Bacchae. Dance also has biblical roots. See e.g., Psalms 149:3 ("let them praise his name with dancing, making melody to him with timbre and lire!"); Psalms 150:4 ("Praise him with timbrel and dance ..."). In ancient Rome, dancing was an important part of the annual festivals of Lupercalia and Saturnalia which featured wild group dances that were the precursors of the later European carnival. Eroticism in dancing also has ancient origins. The modern-day belly dance, or baladi, can be traced to the Egyptians of the fourth century, B.C. Buonaventura, W. Serpent of the Nile (1990). From these ancient roots one can trace the forms of dance native to America. Indeed dance pervades our culture, from the American Ballet Theater to Broadway's A Chorus Line and West Side Story, from Hollywood's Astaire and Rogers to the local discotheque.
 
 
 15
 Dance has been defined as "the art of moving the body in a rhythmical way, usually to music, to express an emotion or idea, to narrate a story, or simply to take delight in the movement itself." 16 The New Encyclopedia Britannica 935 (1989). Inherently, it is the communication of emotion or ideas. At the root of all "[t]he varied manifestations of dancing ... lies the common impulse to resort to movement to externalise states which we cannot externalise by rational means. This is basic dance." Martin, J. Introduction to the Dance (1939). Aristotle recognized in Poetics that the purpose of dance is "to represent men's character as well as what they do and suffer." The raw communicative power of dance was noted by the French poet Stephane Mallarme who declared that the dancer "writing with her body ... suggests things which the written work could express only in several paragraphs of dialogue or descriptive prose."
 
 
 16
 Any attempt to distinguish "high" art from "low" entertainment based solely on the advancement of intellectual ideas must necessarily fail. Judge Easterbrook contends in dissent that music and ballet are protected because music appeals to the intellect and ballet tells stories, whereas nude dancing offers neither. Dissent at 1124. Not all ballet tells stories, however, and not all music appeals to the intellect. The art/entertainment distinction would remove the shield of the first amendment from many forms of nonverbal art because they fail to communicate a defined intellectual thought; this attempted demarcation would leave them essentially unprotected.
 
 
 17
 The State in effect advances the proposition that the dance involved loses its expressive qualities as the dancers lose their clothing. It is well established, however, that "[n]udity alone does not place otherwise protected material outside the mantle of the first amendment." Schad, 452 U.S. at 66, 101 S.Ct. at 2181 (citation omitted). Nor does the fact that the dance is sexual remove the mantle of protection: "Sexual expression which is indecent but not obscene is protected by the First Amendment." Sable Communications v. FCC, --- U.S. ----, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989). And it is immaterial for constitutional purposes that nude dancing may be performed for profit. See Joseph Burstyn v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952). The State's position, therefore, distills down to the assertion that nude dancing is distasteful and/or morally repugnant.
 
 
 18
 While the ideas communicated by a particular dance may well vary according to the context in which it is performed, the communication of expression clearly does not. Attempts to distinguish between expressive and nonexpressive dance are misconceived and bring to mind the words of Justice Harlan in Cohen v. California, 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1970): "[W]e think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual." It is irrelevant for the purposes of our inquiry that we may find the expression inherent in nude dancing to be at odds with our particular tastes; just last Term the Court re-affirmed its belief that "[i]f there is a bedrock principle underlying the first amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." Texas v. Johnson, --- U.S. ----, 109 S.Ct. 2533, 2544, 105 L.Ed.2d 342 (1989). As the Second Circuit has stated:
 
 
 19
 [W]hile the entertainment afforded by a nude ballet at Lincoln Center to those who can pay the price may differ vastly in content (as viewed by judges) or in quality (as viewed by critics), it may not differ in substance from the dance viewed by the person [at the local pub].
 
 
 20
 Salem Inn, Inc. v. Frank, 522 F.2d 1045 (2d Cir.1975) (quoting Salem Inn, Inc. v. Frank, 501 F.2d 18, 21 n. 3 (2d Cir.1974), aff'd in part, Doran v. Salem Inn, Inc., 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975)). The State conceded as much at oral argument when it agreed that the plaintiffs' precise dance routines would certainly be protected expression if they were performing the same routines but choreographed as part of a graduate Ph.D. thesis.
 
 
 21
 To determine whether this activity is sufficiently embodied with communicative expression to warrant first amendment protection, we must ask whether "[a]n intent to convey a particularized message was present and [whether] the likelihood was great that the message would be understood by those who view it." Texas v. Johnson, --- U.S. ----, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (quoting Spence v. Washington, 418 U.S. 405, 410-11, 94 S.Ct. 2727, 2730-31, 41 L.Ed.2d 842 (1974)). The dominant theme communicated here by the dancers is an emotional one; it is one of eroticism and sensuality.[5] Though this dance is clearly of inferior artistic and aesthetic quality as contrasted with a classic ballet such as the Dance of the Seven Veils in Strauss' Salome, the erotic message communicated to the viewers is present in both performances. That Strauss' Salome tells a compelling story and the nude dancing at the Kitty Kat Lounge may not is not determinative; expression does not lose its protection for lack of a scripted plot. And it is apparent that those who view the respective dances readily comprehend the intended messages, for they advance currency to view them. The success of both the ballerina in an erotic production and the nude dancer in a barroom setting depend on the communication of their sensual message.
 
 
 22
 As stated above, dance as entertainment inherently embodies the expression and communication of ideas and emotions. The State's reliance on the nudity and the unappealing nature of the dance involved here do not serve to remove the partial cloak of protection afforded by the first amendment. Nude barroom dancing, though lacking in artistic value, and expressing ideas and emotions different from those of more mainstream dances, communicates them, to some degree, nonetheless.
 
 
 23
 Not only does our holding today comport with Supreme Court precedent, it also is in consonance with the holdings of the numerous federal courts that have addressed the issue. The two Circuit Courts of Appeal that have confronted the protections afforded nude dancing, the Ninth and the Eleventh, have held that it is protected activity under the first amendment. See International Food & Beverage System v. Fort Lauderdale, 794 F.2d 1520, 1525 (11th Cir.1986) (citing Schad to support the proposition that "we may take it for granted that nude dancing is constitutionally protected expression, at least if performed indoors before paying customers and not in a street or park before casual viewers"); Krueger v. City of Pensacola, 759 F.2d 851, 854 (11th Cir.1985) (in addressing ordinance barring topless dancing, the court noted that "we are bound to treat topless dancing as a form of expression which is protected at least to some extent by the First Amendment"); Kev, Inc. v. Kitsap County, 793 F.2d 1053, 1058 (9th Cir.1986) (relying on Schad and Doran for its determination that "topless dancing [is] expression, subject to constitutional protection within the free speech and press guarantees of the first and fourteenth amendments"); BSA, Inc. v. King County, 804 F.2d 1104, 1107 (9th Cir.1986) (in holding that nude dancing is protected activity, the court found that the assertion that "barroom nude dancing is not First Amendment activity because it is non-expressive and lacks any communicative content" is "controverted by Schad "); Kuzinich v. County of Santa Clara, 689 F.2d 1345 (9th Cir.1982). The district courts are in general agreement as well. See, e.g., Walker v. City of Kansas City, Mo., 691 F.Supp. 1243, 1249 (W.D.Mo.1988) (citing Schad for proposition that "since an entertainment program may not 'be prohibited solely because it displays the human nude figure,' nude dancing is protected expression under the First Amendment"); Doe v. City of Minneapolis, 693 F.Supp. 774, 779 n. 12 (D.Minn.1988) ("live nude dancing is also protected expression under the First Amendment").[6]
 
 
 24
 Our inquiry cannot end here. Having concluded that the activity involved is within the ambit of the first amendment, we must next examine whether the Indiana statute is a valid restriction on that protected expression. Regrettably, Indiana does not record the legislative history of its statutes. At oral argument the State asserted that the purpose of the public indecency statute was the protection of public morality generally, and the family structure in particular. The State possesses the broad powers to effectuate this legitimate and significant interest through public education and the appropriate exercise of its police powers. However, in advancing this interest it must operate within the prescriptions of the first amendment.
 
 
 25
 It is a fundamental precept of the first amendment that all expression, whether it is written, pictorial or by way of performance, is presumptively protected against government interference and restraint. Doran v. Salem Inn, Inc., 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). The first amendment does not discriminate among ideas. The messages conveyed by the performances in question, no matter how unappealing to one's personal value system, are protected nonetheless. Indiana's attempt to ban nude dancing in pursuit of its aforementioned interest is a forbidden interference and restraint because it seeks to withdraw this non-obscene and protected communication from the realm of public discourse.[7] "When the government, acting as censor, undertakes selectively to shield the public from some kinds of [expression] on the grounds that they are more offensive than others, the First Amendment strictly limits its power." Erznoznik v. City of Jacksonville, 422 U.S. 205, 211, 95 S.Ct. 2268, 2273, 45 L.Ed.2d 125 (1975). As we have recognized, "above all else, the First Amendment means that government has no power to restrict expression because of its message or ideas ..." American Booksellers Ass'n v. Hudnut, 771 F.2d 323, 328 (7th Cir.1985), aff'd without opinion, 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986) (Easterbrook, J.) (quoting Police Department v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972)). To those who understandably find objectionable the type of conduct sought to be condemned by the State, we offer the prescription of Justice Brandeis in Whitney v. California, to wit: "the remedy to be applied is more speech, not enforced silence." 274 U.S. 357, 377, 47 S.Ct. 641, 649, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring).
 
 
 26
 This is not to suggest that the State is powerless to regulate the presentation of nude dancing. On the contrary, the State retains a great deal of control. A sovereign may establish reasonable time, place and manner restrictions on protected expression. Renton v. Playtime Theatres, Inc., 475 U.S. 41, 46-47, 106 S.Ct. 925, 928-29, 89 L.Ed.2d 29 (1986). Such legislative power unquestionably permits the state to bar the imposition of nude dancing upon the public in settings such as streets, parks and beaches. Similarly, it may regulate expressive conduct for reasons unrelated to the suppresion of speech. United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). It may also regulate nude dancing under the power granted it by the twenty-first amendment. California v. LaRue, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972); City of Newport v. Iacobucci, 479 U.S. 92, 107 S.Ct. 383, 93 L.Ed.2d 334 (1986). And it most certainly may ban obscene nude dancing. Sable Communications, 109 S.Ct. at 2835. Despite the State's laudable concerns which apparently are the bases of the Indiana statute, the total ban at issue here does not fall within any of these constitutionally permissible areas of legislation. If the State wishes to regulate non-obscene expressive activity or public nudity, it may do so, but only in consonance with the first amendment.
 
 III.
 
 27
 The statute is unconstitutional as applied. Accordingly, the judgment of the district court is REVERSED and the State is enjoined from enforcing its public indecency statute, IND.CODE 35-45-4-1, against these plaintiffs to prohibit non-obscene nude dancing as entertainment.
 
 CUDAHY, Circuit Judge, concurring:
 
 28
 I concur in Judge Flaum's excellent opinion for the court. He has effectively marshalled the Supreme Court and other authority that points in the direction of constitutional protection for nude dancing qua entertainment. That authority compels a result that is correct in this case.
 
 
 29
 I do, however, have concerns that I shall briefly note. Despite impressive displays of scholarly analysis and broad-ranging erudition on all sides, the need to invoke the First Amendment here strikes me as a bit trivializing and, perhaps, unworthy. The application of the Amendment to these facts is correct as a matter of law. I believe we of the majority are doing what the law commands, but the high purposes of the Amendment seem, in these circumstances, in some danger of being lost.[1]
 
 
 30
 It seems to me beyond doubt that a barroom striptease is "expressive." Even if relatively restrained, as are the videos in evidence here, a striptease sends an unadorned message to a male audience. It is a message of temptation and allurement coupled with coy hints at satisfaction. In a real barroom, messages would probably also flow in the opposite direction, in the form of encouraging comments to the performer from the patrons.[2] These responses speak strongly to the fact that a message is being sent and received. It is also clear that the message of the striptease is not a subject that the Founding Fathers had in mind in drafting the First Amendment.[3] That fact is certainly not dispositive, nor perhaps even probative, but it suggests a need for caution in making the Amendment do service in situations as improbable as this one seems to me.
 
 
 31
 POSNER, Circuit Judge, concurring in the opinion and judgment of the court.
 
 
 32
 Public performances of erotic dances debuted in Western culture in the satyr plays of the ancient Greeks, were suppressed by Christianity, and, with Christianity's grip loosening, reappeared in the late nineteenth and early twentieth centuries. They reappeared in a variety of forms: as the can-can and the music-hall chorus line, from which the Folies Bergere and its tame American counterparts--the Ziegfeld Follies, and more recently the Radio City Music Hall Rockettes and the chorus lines in Broadway and Hollywood musicals--descend. As the Dance of the Seven Veils in Richard Strauss's opera Salome (1905), from which the fan dancing of Sally Rand and the decorous striptease of Gypsy Rose Lee, or of Gwen Verdon in the musical comedy Damn Yankees, may be said to descend. Ballet was nothing new in the nineteenth century; but as the costumes of ballet dancers became scantier, the erotic element in ballet became more pronounced, reaching scandalous proportions in Diaghilev's L'apres midi d'un faune (1912) (an example, and not an isolated one, of male erotic dancing) and becoming a staple of distinguished companies like the New York City Ballet and the American Ballet Theater. "Modern dance," a ballet offshoot pioneered by, among others, the erotic dancer Isadora Duncan, has long been partial to nudity. Examples of erotic dance in non-Western cultures include not only belly dancing but also the overtly erotic nude dancing of Les Ballets Africains de Keita Fodeba, which, but for its exoticism, would be considered shockingly explicit. For remarkable description of fertility dances see Sachs, World History of the Dance 85-104 (1937); on erotic and nude dancing generally, see Cheshire, Eroticism in the Performing Arts, in Webb, The Erotic Arts 297-306 (rev. ed. 1983); Sorell, Dance in Its Time 425-28 (1986). The law's efforts to restrict such dancing are detailed in an Annotation, Topless or Bottomless Dancing or Similar Conduct as Offense, 49 A.L.R.3d 1084 (1973), 49 A.L.R.3d Supp. 59 (1989).
 
 
 33
 De gustibus non est disputandum; but whether one has a taste or a distaste for erotic dance in general or striptease dances in particular, to say as the district judge did in this case that a striptease dance is not "expressive activity," but "mere conduct," Glen Theatre, Inc. v. Civil City of South Bend, 695 F.Supp. 414, 419 (N.D.Ind.1988), is indefensible and a threat to artistic freedom. This is not to suggest that the State of Indiana has no power to regulate nude striptease dancing; it has ample power. But to try to justify that power, as the district judge in this case tried, on the ground that such dancing is not expression is misguided. And, as the parties have framed the issues, no alternative justification is possible in this case. The qualification is an important one, and I shall return to it.
 
 
 34
 An Indiana statute makes public indecency, including appearing nude in public, a crime. Ind.Code Sec. 35-45-4-1(a)(3). The normal operation of the statute is illustrated by Elliott v. State, 435 N.E.2d 302 (Ind.App.1982), where the defendant was convicted of urinating in public. However, in State v. Baysinger, 272 Ind. 236, 397 N.E.2d 580 (1979), appeal dismissed for want of a substantial federal question under the name Clark v. Indiana, 446 U.S. 931, 100 S.Ct. 2146, 64 L.Ed.2d 783 (1980), the Indiana Supreme Court interpreted the statute to apply to nude entertainment in theaters, nightclubs, and other establishments open to the public. The interpretation was not inevitable. State v. Brooks, 275 Or. 171, 550 P.2d 440 (1976); compare City of Chattanooga v. McCoy, 645 S.W.2d 400, 401 (Tenn.1983). But, having been made, it induced the Indiana court in Baysinger, in an effort to save the constitutionality of the statute, to carve out an exception for performances having an expressive character. That is how the issue of "expression" got into this case. If the striptease dances that the plaintiffs want to put on for their customers are not expressive, then since at the end of the dances the dancers are nude, the statute makes the dances criminal.
 
 
 35
 Indiana is exceptional although not unique among contemporary American states in attempting, without recourse to the Twenty-First Amendment, to impose a state-wide ban on erotic dance performances that are not obscene, merely because the performances involve nudity--and a bare breast is nudity within the meaning of the Indiana statute. The statute's reach may be an accident of interpretation. The intended scope may well have been narrower; and a differently drafted statute could, as I shall explain, achieve the state's legitimate goals without raising serious constitutional questions. So this case may be something of a freak; but it is a fascinating freak.
 
 
 36
 If the district judge had said that the dances in issue are not classy, he would have been on sound ground. The record contains a videotape of the dances that the proprietor of the "Kitty Kat Lounge" would like to exhibit. The name of the establishment does not promise high culture, nor the fact that it is a bar rather than a theater, nor (a related point) that the compensation of the dancers depends on the number of drinks they induce appreciative customers to buy after the dance. The dancers are presentable although not striking young women. They dance on a stage, with vigor but without accomplishment, to the sound of a jukebox, and while dancing they remove articles of clothing (beginning, for example, with a glove) until nothing is left. Thirty years ago a striptease that ended in complete nudity would have been thought obscene. No more. It is worth pausing a moment to ask why. Nudity as titillation or outrage is relative rather than absolute. In a society in which women customarily go about in public bare-breasted, there is no shock value in a bare breast, while in Victorian England, where decent women were expected to wear dresses that reached from the top of the neck to the floor--where even the legs of furniture were sometimes clad for the sake of decency--a bare ankle was a sensation. Since then female dress has become progressively less modest, and today many decent women appear in public in states of undress (mini-skirts, hot pants, slit skirts, body stockings, see-through blouses, decolletage becoming outright topless evening wear) that would have been considered nakedness, or the garb of prostitutes, thirty years ago. A striptease that ended in a degree of nudity no longer suggestive of preparations for sex--a striptease that left the stripper garbed as she might be for an expedition to the supermarket--might lack erotic punch today.
 
 
 37
 In any event there is no contention that the stripteases of the "Kitty Kat" dancers are obscene. It would be difficult to make such a contention with a straight face at a time when a career respectable in the eyes of many people can be founded on posing in the nude for men's magazines. Douglass v. Hustler Magazine, Inc., 769 F.2d 1128 (7th Cir.1985). The contention, rather, is that the dances are not expressive, so the First Amendment does not protect them, so there is no obstacle to enforcing the Indiana statute against the dancers and their accomplice, the proprietor of the Kitty Kat Lounge. If this reasoning is correct, the arts are in jeopardy.
 
 
 38
 Dance, as Judge Flaum emphasizes with pertinent references, is a medium of expression, of communication. What it expresses, what it communicates, is, like most art--particularly but not only nonverbal art--emotion, or more precisely an ordering of sights and sounds that arouses emotion. Ballet is "an exact and flexible language to communicate formal fantasy." Denby, Dance Writings 507, 509 (1986). "In your excitement as you watch the quick dancing, it will often evoke in passing an intensely poignant fantasy image of human relations." Id. at 512. "Susceptibility to ballet is a way of being susceptible to animal grace of movement." Id. at 530. Erotic dances express erotic emotions, such as sexual excitement and longing. Nudity is the usual state in which sexual intercourse is conducted in our culture, and disrobing is preliminary to nudity. But of course nudity and disrobing are not invariably associated with sex. The goal of the striptease--a goal to which the dancing is indispensable--is to enforce the association: to make plain that the performer is not removing her clothes because she is about to take a bath or change into another set of clothes or undergo a medical examination; to insinuate that she is removing them because she is preparing for, thinking about, and desiring sex. The dance ends when the preparations are complete. The sequel is left to the viewer's imagination. This is the "tease" in "striptease."
 
 
 39
 Because the dancers at the Kitty Kat Lounge are not professional dancers, because three of the four dances were not choreographed, because the music to which they dance is canned, and because the dancers sell drinks to the customers afterward, it is tempting to suppose that the "expressive" elements of their "performance" are phony--that the dance and the music are figleaves to conceal the absence of figleaves. Probably the supposition is erroneous; certainly it is not backed by evidence. The striptease was not invented in order to place a cultural patina on displays of naked women. Of course, there would be no female stripteases without a prurient interest in the female body; but that is just to say that there would be no erotic art without Eros. Though there is no striptease without some stripping--in today's moral climate, without a great deal of stripping--the dancing and the music are not distractions from the main theme, patched on to fool the censor; they are what make a given female body expressive of a specifically sexual emotion. The striptease is the ensemble of the music, the dance, the disrobing, and the nude end state; it is more erotic than any of its components; and what makes it more erotic than the body itself, or the disrobing itself, is, precisely, that it is expressive of erotic emotion. The State of Indiana may be empowered to regulate or even suppress it, but not on the ground that it is not expression.
 
 
 40
 The conclusion that striptease is an expressive medium can be resisted on four grounds: the conclusion leads to a reductio ad absurdum; the only expression protected by the First Amendment is the expression of ideas and opinions; the amendment does not protect mere entertainment; the amendment protects speech, not conduct.
 
 
 41
 1. It is tempting to argue that a striptease just can't be expressive because if it is then everything is--including kicking one's wastebasket in anger and putting geraniums in a window box. These examples are not the same, however. There is a sense in which everything we do consciously and much of what we do unconsciously is expressive--is the visible counterpart to (or "expression" of) some "inner" mental state, often an emotion such as anger or fear or joy. Kicking the wastebasket is expressive in this sense. But the expression that is relevant to freedom of speech, and absent when the wastebasket is kicked in private, is the expression of a thought, sensation, or emotion to another person. This is a narrower concept of expression than the first but it is of course enormously broad, encompassing not only the geranium example but the whole field of human communication, verbal and nonverbal. We communicate with each other by dress, grooming, deportment, and gestures, as well as by words. Not everything in this enormous range of communicative activity is within the scope of the First Amendment. Social dancing is not. City of Dallas v. Stanglin, --- U.S. ----, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989). Nor is casual chit-chat. Swank v. Smart, 898 F.2d 1247, 1250-51 (7th Cir.1990). But what is excluded is not excluded because it is not expression; it is expression.
 
 
 42
 Let me try to refine the distinction between the expressive and the protected with the following unrefined examples: a videotape of a couple engaged in sexual intercourse, filmed without their knowledge and exhibited to the patrons of the Kitty Kat Lounge; the same videotape, made to be shown to psychologists specializing in the treatment of sexual dysfunction; a videotape of a couple, also engaged in sexual intercourse, but the man and the woman are actors who endeavor by their movements and expressions to maximize the emotional impact of their act on the viewer. The first videotape is not expressive, but is obscene (nude sunbathing would also be nonexpressive, but would not be obscene). The second is neither. The third is expressive and obscene. The third is not saved from condemnation because it is expressive. Most pornography is expressive, indeed expressive of the same emotions that a striptease expresses. The difference is that the striptease is not obscene by modern standards.
 
 
 43
 If this analysis is wrong, our decision in American Booksellers Ass'n, Inc. v. Hudnut, 771 F.2d 323 (7th Cir.1985), aff'd without opinion, 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986), is wrong. Indianapolis had enacted an ordinance forbidding "pornography," defined as "the graphic sexually explicit subordination of women" through various means including pictures of women in "postures or positions of ... display." The videotape of the Kitty Kat dancers is pornography within the meaning of the ordinance. We held that the ordinance violated the First Amendment because it was an effort to control the way people think about women and sex. Neither the ordinance, nor our ground for invalidating it, would have made sense if pornography were not expressive in a sense relevant to the First Amendment. The doctrine that forbids restrictions on speech that are based on the viewpoint of the speaker is a doctrine of the First Amendment; its invocation presupposes that what is being restricted is speech. An ordinance that forbade nude sunbathing would not violate the First Amendment even if the purpose was to change people's thinking about women and sex, because it would not be prohibiting "speech," however broadly defined. People v. Hollman, 68 N.Y.2d 202, 507 N.Y.S.2d 977, 500 N.E.2d 297 (1986); South Florida Free Beaches, Inc. v. City of Miami, 734 F.2d 608 (11th Cir.1984). Unless nonobscene pornography (a category that includes nude striptease dancing) is speech, the Indianapolis ordinance could not have violated the First Amendment.
 
 
 44
 2. The second argument against acknowledging that striptease dancing is expression is that it is not the type of expression that the First Amendment protects, because it is not the expression of ideas or opinions. Indeed it is not the expression of ideas or opinions (nor have the appellants ever contended otherwise). But if this were decisive against the application of the First Amendment, as urged for example in Wright, A Rationale From J.S. Mill for the Free Speech Clause, 1985 S.Ct.Rev. 149, 164-69, it would thrust outside the amendment's boundaries virtually all nonverbal art--except the relatively small fraction that is didactic--and much literature as well. The implications for nonvocal music are particularly arresting. By straining one can perhaps find "ideas" in a few tone poems and other programmatic music. For example, the opening chords of Richard Strauss's Ein Heldenleben (A Hero's Life ) may be said to convey an idea of the heroic. But what is really being conveyed is not an idea but a feeling, a feeling of grandeur that evokes or enhances the idea of the heroic; and in part the feeling is conveyed (or identified) by the title of the piece. Beethoven's heavy use of march themes lends, by association, a martial air to much of his music, yet it would be odd to describe the music as being "about" political or military affairs. Music that imitates the twittering of birds does not convey an ornithological "message," and Gustav Holst's The Planets is not a treatise on astronomy. Some nonvocal musical works convey simple narratives, for example the story of the cathedral that rises from and sinks back into the sea, "told" in Debussy's La Cathedrale engloutie. But narratives are not ideas, and anyway a striptease is a narrative quite as elaborate as that found in pantomimic ballets (such as Romeo and Juliet ) and more elaborate than the narratives in wordless music. Most nonvocal music has no verbal--paraphrasable--content whatsoever, and much of it does not even express a specific emotion.
 
 
 45
 Admittedly, not all thought is verbal, especially if "language" is narrowly interpreted to exclude mathematics and other nonverbal symbolic systems. But even if "thought," "concept," "idea," and "opinion" are broadly defined, these are not what most music conveys; and even if music is regarded as a language, it is not a language for encoding ideas and opinions. Insofar as it is more than beautiful sound patterns, music, like striptease, organizes, conveys, and arouses emotion, though not sexual emotion primarily. If the striptease dancing at the Kitty Kat Lounge is not expression, Mozart's piano concertos and Balanchine's most famous ballets are not expression. This is not to suggest that striptease dancing is indistinguishable from these other forms of expression. But they cannot be distinguished on the ground that a piano concerto and a (nonpantomimic) ballet express ideas and a striptease expresses emotion. If the concerto and the ballet have meaning--and I do not doubt that there is a meaningful sense in which they do--so has the striptease.
 
 
 46
 Pictorial art is in some ways closer to striptease than music is, because so much painting and sculpture are of naked women. The distinguished collection of Titian nudes in the National Gallery in Washington includes Venus With a Mirror, which depicts a voluptuous, coiffed and bejewelled, golden-haired woman--nude within the meaning of Ind.Code Sec. 35-454-1(b)--sitting on a couch and looking at her face in a mirror held up by a cherub (Cupid--his quiver is at his feet), while another cherub hovers beside her waiting to crown her with a wreath. Walker, The National Gallery of Art 209 (1975) (pl. 259). The painting does not express an idea, a thought, or an opinion. It is not a sociological account of a sixteenth-century Venetian woman's toilette, or a treatise on classical mythology. It uses that mythology as a source of iconography, and to the extent that by doing so the painting evokes the story of Venus it may be said to have narrative content; but so does a striptease. What the painting primarily conveys to the viewer is not a story, let alone an idea or an opinion, but a complex of feelings--feelings of voluptuousness, sensuality, beauty, harmony, sumptuousness, sexual allure (we know what Venus is the goddess of).
 
 
 47
 We might try to close the gap between the intellectual and the emotional by saying that the painting expresses a concept of beauty, of opulence, of balance, and so forth. But among the "so forth" are feminine sexuality and desirability, and if these are "concepts" in Venus With a Mirror they are "concepts" in a striptease (or in a Playboy pin-up) in just the same sense. The striptease version is coarse, unsubtle, "artless," even degraded, but the two works are "conceptual" to the same degree. Feminists forcefully assert the continuity of high and low culture: "Within the history of art, the female nude ... is a paradigm of Western high culture with its network of contingent values: civilization, edification, and aesthetic pleasure. The female nude is also a sign of those other, more hidden properties of patriarchal culture, that is, possession, power, and subordination." Nead, The Female Nude: Pornography, Art, and Sexuality, 15 Signs 323, 326 (1990). The feminists have a point, even if it is overstated; a more neutral observer (criticized by Nead, id. at 332) has called Titian's Venuses "highly erotic and presumably highly effective pin-ups for the rich and powerful." Webb, supra, 131.
 
 
 48
 The reason we think that art is an intellectual medium and therefore has nothing important in common with striptease is that most of us obtain no enjoyment from art. It requires an educated taste to distinguish Venus With a Mirror from a camp photo of a fat woman. Knowing that it is a cultural monument we assume that its significance must be intellectual, since it is dead to most of us emotionally. But the painting is not an intellectual statement; there are no ideas in the painting. This would be even clearer if one were speaking of abstract rather than representational painting. There is pattern, design, harmony, and color in abstract painting, and these attributes evoke pleasure and other emotions in an appreciative viewer. But there is no story, no articulable idea, no verbal meaning. The notion that all art worthy of the name has a "message" is philistine, and leads to the weird conclusion that nonrepresentational art and nonprogrammatic, non-vocal music are entitled to less protection under the First Amendment than striptease dancing because the latter has a more distinct, articulable message. And likewise that Beethoven's string quartets are entitled to less protection than Peter and the Wolf.
 
 
 49
 I said earlier that nudity is a relative concept. The bare breast of Venus in Venus With a Mirror is tame stuff by modern standards and this tameness may lead us to downplay or even overlook the erotic element in the painting. If we consider instead the nudes of a great modern master, such as Balthus (Balthasar Klossowski), we cannot overlook the primacy of the erotic in nude painting. For examples, see Alice, Nude With a Cat, and The Room, in Rewald, Balthus 28, 117-19 (1984) (fig. 35 and pls. 31 and 32). Balthus's eroticism happens not to be of the innocent and wholesome variety; it is sinister, creepy, obsessed with the bodies of prepubescent girls (girls Lolita's age), "Freudian," at times sadistic. Balthus is a great artist whose artistic interest in the female body is prurient. Strauss's Salome--whose Dance of the Seven Veils is everyone's favorite example of constitutionally protected striptease--is a classic of fin de siecle decadence; it is surpassed in unwholesomeness only by Oscar Wilde's play Salome, which supplies the libretto for Salome, and by Aubrey Beardsley's illustrations for Salome. The difference between Balthus' presentation of the naked female body and that of the dancers at the Kitty Kat Lounge is that he is a great artist and they are undistinguished popular entertainers. It is not a difference in kind; it is not a difference between expressive and nonexpressive activity; it is not a difference between arty nudes and naked bodies. It is a difference in aesthetic quality, and while such differences can redeem obscene art, Miller v. California, 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973), they cannot justify the suppression of the nonobscene.
 
 
 50
 Some paintings--Rembrandt's portraits, for example--we are inclined to call "profound." This usage is fine, provided we understand that the profundity in question is not intellectual but emotional. Here is a description of the self-portrait that Rembrandt painted in 1659 (Walker, supra, at 271 (pl. 357)), three years after he had declared bankruptcy. "He saw reflected [in the mirror from which he painted the portrait] a face lined with age and misfortune. He saw eyes which had searched more profoundly into the human soul than those of any other artist. He saw a mouth and chin weak, infirm of purpose, manifesting that flaw in his character which had ruined his life. His hands are grasped as though in anguish at the spectacle of a self-ruined man. There exists no painting more pitiless in its analysis or more pitiful in its implications." Id. at 270. "Analysis" is being used here in a special sense. There is nothing discursive, verbal, intellectual in the portrait. It is not a commentary on bankruptcy law, human weakness, or social injustice. It is the pictorial rendition of the emotions that a man in whom great talent is mixed with great weakness might feel. The mood is remote from that of Venus looking in her mirror but the difference has nothing to do with the epistemic character of these paintings. The difference between the intellectual and the emotional is not the difference between heavy and light. There are solemn emotions, and there are frivolous ideas.
 
 
 51
 The emotional element predominates in much verbal art as well as in most nonverbal art. When T.S. Eliot wrote
 
 Highbury bore me. Richmond and Kew
 Undid me. By Richmond I raised my
 
 52
 knees
 
 
 53
 Supine on the floor of a narrow canoe.
 
 My feet are at Moorgate, and my heart
 Under my feet. After the event
 
 54
 He wept. He promised 'a new start.'
 
 I made no comment. What should I re
 
 55
 sent?
 
 
 56
 he was not expressing an idea; he was finding a form of words by which to convey the emotion of sexual revulsion. There is an analogy to the distinction in copyright law between idea and expression. Eliot could not have obtained copyright protection for any of the ideas that might be extracted from The Waste Land by paraphrase: in the passage I have quoted, the idea that sex is sordid and disgusting. He could obtain copyright protection only for the precise verbal form in which the idea was expressed. It is the expression that gives the idea impact, just as it is the dancing and the music and the stripping that give the nudity of the striptease dancer impact. The idea in itself is nothing--banal, undeveloped, mostly false--just as nudity in itself is nothing, or very little. These are just the materials from which the great writer or the popular entertainer makes the emotional brew that we call art or popular entertainment. In either case the artist's business is emotion, not ideas. Of one literary artist Eliot said, "He had a mind so fine that no idea could violate it." Henry James, in Selected Prose of T.S. Eliot 151 (Kermode ed. 1975).
 
 
 57
 One can argue from the text and background of the First Amendment that the constitutional protection of freedom of speech is limited to the discursive and the didactic, that nondidactic art should be totally excluded, or at the very least that low-grade erotic entertainment should be--the Founding Fathers would writhe in their graves if they knew that the nude dancers of the Kitty Kat Lounge could unwrap themselves with the First Amendment. And one can reply that such arguments merely demonstrate the inadequacy of original understanding as a guide to constitutional interpretation; that they would if accepted change the Constitution from a living document into a petrified reminder of the limits of human foresight; that a conception of free speech which privileges the burning of the American flag (Texas v. Johnson, --- U.S. ----, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)) but permits government to ban performances of twelve-tone music is more absurd than one that protects flag burning, twelve-tone music, and striptease; and that if the purpose and scope of the First Amendment's speech and press clauses are exhausted in the protection of political speech, because freedom of political speech is all that is necessary to preserve our democratic political system, this implies the exclusion from the amendment's protections not only of all art (other than the political) but also of science. For one can have democracy without science, just as one can have democracy without art.
 
 
 58
 The debate has been resolved--for judges at our level anyway, and for now anyway--by the decisions anatomized in Judge Flaum's opinion, particularly the Supreme Court's decision last term in Ward v. Rock Against Racism, --- U.S. ----, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (citations omitted):
 
 
 59
 Music is one of the oldest forms of human expression. From Plato's discourse in the Republic to the totalitarian state in our own times, rulers have known its capacity to appeal to the intellect and to the emotions, and have censored musical compositions to serve the needs of the state. The Constitution prohibits any like attempts in our own legal order. Music, as a form of expression and communication, is protected under the First Amendment. In the case before us the performances apparently consisted of remarks by speakers, as well as rock music, but the case has been presented as one in which the constitutional challenge is to the city's regulation of the musical aspects of the concert; and, based on the principle we have stated, the city's guidelines must meet the demands of the First Amendment.
 
 
 60
 The rock music in question had lyrics. But the Court's reference in the second sentence to music's appeal to the emotions, and its citation (omitted from the quotation) to an article about Soviet ambivalence toward Stravinsky--a composer primarily of nonvocal music--make it implausible to suppose that the Court thought it was speaking only of vocal music; and it did not say it was. In another decision the Court has said that "entertainment, as well as political and ideological speech, is protected" by the First Amendment. Schad v. Borough of Mount Ephraim, 452 U.S. 61, 65, 101 S.Ct. 2176, 2180, 68 L.Ed.2d 671 (1981). This court has held that wordless music is speech within the meaning of the amendment. Reed v. Village of Shorewood, 704 F.2d 943, 950 (7th Cir.1983).
 
 
 61
 I am less interested in particular decisions than in fundamental principle. If the only expression that the First Amendment protects is the expression of ideas and opinions, then most music and visual art, and much of literature, are unprotected. This would be a shocking contraction of the First Amendment as it has come to be understood. If the only way to exclude nude dancing from the protection of the amendment is to exclude all nonpolitical art and literature as well, the price is too high. "A rule cannot be laid down that would excommunicate the paintings of Degas." Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 252, 23 S.Ct. 298, 301, 47 L.Ed. 460 (1903).
 
 
 62
 3. Maybe the price need not be paid; maybe "mere entertainment" is not constitutionally protected after all. The passage I quoted from Schad cannot have been meant literally. Anything that gives pleasure can be counted as entertainment, yet not everything that gives pleasure is expressive. I might find a display of northern lights entertaining; this would not make that display an expressive activity. However, while not all entertainment is expressive, some certainly is. Art is entertainment. Not only is much art created in order to entertain--Shakespeare's plays, for example--but art that was religious or political in its origins is today valued largely for its entertainment value. The Homeric epics and the religious art of the Renaissance are examples. For those who actually love art it is primarily as a superior form of entertainment and consolation that it is loved rather than as a source of insight or edification, although it often is that as well. So as a classification for use in applying the First Amendment, "entertainment" is both underinclusive and overinclusive. It includes things that the First Amendment cannot possibly be thought to include (such as the northern lights) and it excludes things--namely, most of art--that it is the whole purpose of the classification to include.
 
 
 63
 Still, can the First Amendment really be thought to cover all expressive entertainment? The example of bullfighting comes to mind. Bullfighting is an expressive activity and even has affinities to the dance. There is music, pageantry, elaborate costumes, the march of the toreadors, the dance-like steps with which the matador incites and parries the bull, the picadors on their splendidly caparisoned prancing horses. The whole is orchestrated and choreographed for maximum emotional impact; among the feelings conveyed are grace, courage, suffering, fear, beauty, cruelty, splendor, and machismo. Hemingway, Death in the Afternoon (1932). Bullfighting is more expressive, more artistic, culturally richer than the most popular American sports. Is it therefore protected by the First Amendment? It is not; the First Amendment no more forbids the prohibition of bullfighting than it does the prohibition of obscenity. There are many grounds for regulating and even prohibiting particular forms of expressive activity. In the case of bullfighting, the grounds are aversion to mutilating or killing animals for sport and also aversion to sports that are highly dangerous to the (human) participants. The Constitution does not place freedom of expression above all other values; it does not privilege gladiatorial contests any more than it privileges the employment of children to make pornographic movies. Nevertheless when government suppresses bullfights it is not suppressing mere "entertainment" that has little in common with ballet. They have a great deal in common. The difference between bullfighting and ballet has nothing to do with expressiveness; they are equally expressive, albeit of a different range of emotions. The pertinent difference is that ballet does not entail the torture and killing of animals or a high risk of injury or death to the dancers, and bullfighting does.
 
 
 64
 In calling bullfighting "expressive" I may seem to be implying, despite my disclaimer, that bullfighting must be protected by the First Amendment from regulation or suppression; for does not the amendment protect freedom of expression? I repeat that I do not believe that the First Amendment protects bullfighting. But I insist that bullfighting is an expressive activity. To deny this would be to play the unedifying semantic game of persuasive definition. Bullfighting is forbidden not because it is not expressive, but because in American society its harmful consequences are thought to outweigh its expressive value.
 
 
 65
 I said earlier that casual chit-chat, although an expressive activity, is not protected by the First Amendment. A public theater that ejects a patron for talking to his neighbor during the performance of a play does not commit a prima facie violation of the First Amendment. Perhaps, like casual social conversation, the striptease makes so little contribution to the marketplace of ideas that it can be suppressed even though it is an expressive activity formally akin to the highest forms of art. But here we risk being misled by metaphor. "Marketplace of ideas," useful short-hand though it is for the domain of the First Amendment, leaves out not only nude dancing but also the greater part of art, as well as much of politics, of journalism, of education, of philosophy, of law, and in short of nonscientific discourse generally, for such discourse is heavily rhetorical, emotive. To observe that ordinances forbidding nude dancing in bars "do not prohibit an exchange of ideas which might tend to bring about political or social change," Yauch v. State, 109 Ariz. 576, 579, 514 P.2d 709, 712 (1973), or that "it is difficult to conceive of ideas entitled to First Amendment protection which can be solely--or even best--expressed by baring the anus or genitals," Kew v. Senter, 416 F.Supp. 1101, 1105 (N.D.Tex.1976), is correct; it just misses the point. Art and popular entertainment are not awkward or failed attempts to communicate ideas, and the protection of the First Amendment is not limited to ideas.
 
 
 66
 Once the relevant marketplace is understood to include expressive activity concerned with the emotions as well as expressive activity concerned with ideas--to include narrative, imagery, rhetoric, and design, as well as discursive prose--it becomes evident that erotic performances are a major component of the First Amendment marketplace, while social conversation, ballroom dancing, and other "audience of one" communicative activities are a minor component. Granted, the suppression of one genre of erotic art, the striptease, would not truncate the marketplace greatly. But lest its suppression turn out to be the first step on the road back to the institutionalized puritanism of Cromwell's reign--during which all theatrical performances, including performances of Shakespeare's plays, were prohibited--we need a principled ground for distinguishing the striptease (or some subcategory of striptease typified by the dances at the Kitty Kat Lounge) from other forms of nonobscene erotic expression. None has been suggested. At argument, the lawyer for the State of Indiana proposed to limit the protected category to "established" works of art. This approach would have excluded Manet's great work Dejeuner sur l'herbe, in which a naked woman is depicted picnicking with two fully clothed men; far from being an established work of art when it first burst on the art scene in 1863, it caused a scandal.
 
 
 67
 Although much of today's high culture began as popular entertainment, the likelihood that the videotape of the Kitty Kat stripteases will one day achieve the cultural renown of Dejeuner sur l'herbe is vanishingly close to zero. Anyone who doubts this is carrying relativism and skepticism too far. But aesthetic quality cannot be the standard that judges use to determine which erotic performances can be forbidden and which cannot be. There are no objective standards of aesthetic quality, and while we allow obscene works to be "redeemed" by "evidence" of aesthetic quality, it hardly follows that we should allow works that are not obscene to be condemned on the basis of evidence suggesting a lack of aesthetic quality. On the contrary, the fact that the law protects obscene art attests to a justified modern anxiety about censorship. The practical effect of letting judges play art critic and censor would be to enforce conventional notions of "educated taste," and thus to allow highly educated people to consume erotica but forbid hoi polloi to do the same. The robust paternalism and class consciousness that once permitted such a distinction have lost their legitimacy. The music held constitutionally protected in Reed v. Village of Shorewood was rock and roll. The Constitution does not look down its nose at popular culture even if its framers would have done so. Salem Inn, Inc. v. Frank, 522 F.2d 1045 (2d Cir.1975). "[T]he taste of any public is not to be treated with contempt. It is an ultimate fact for the moment, whatever may be our hopes for a change." Bleistein v. Donaldson Lithographing Co., supra, 188 U.S. at 252, 23 S.Ct. at 301. As applied by the district court in this case, the Indiana statute with its judge-made exception for "expressive" nudity discriminates between upper-class and lower-class nonobscene erotica. The First Amendment forbids this kind of discrimination.
 
 
 68
 I have been assuming that the line between expressive (in the sense of communicative) activity and nonexpressive activity is distinct. It is not. Wright, supra, at 166-68. There are some clearly expressive activities and some clearly nonexpressive ones but there is also a vast gray area populated by street performers who swallow swords or walk on glowing coals or guess people's ages or weights, by people who wish to make a "statement" by dressing outlandishly, by creators of video games, by contestants in dance marathons, and so on without end. The government has a greater scope for regulation in the gray area. Maybe, indeed, that area could be regarded as outside the boundaries of the First Amendment (de minimis non curat lex ), in which event the only constitutional constraints would be those very loose ones that the due process clause places on harmless liberties not involving the exercise of freedom of expression. Swank v. Smart, supra, 898 F.2d at 1251-52. In claiming that expression is a continuum I am not contending that the boundaries of the First Amendment must be left utterly elastic. It is desirable to have some First Amendment rules and not leave everything to be governed by standards and sliding scales. Put more precisely, standards and sliding scales can be used to precipitate out rules, and have been used in this way. The rule that social dancing is not an activity protected by the First Amendment, and the rule that social conversation is not, are crystallizations of a process of weighing the relevant policies and values to determine the amendment's appropriate scope. Another sensible First Amendment rule might be that government has carte blanche to regulate dangerous sports, irrespective of the expressive content of some of those sports; that would take care of bullfighting. There may be room for rules about public nudity as well. What is indefensible is to set up "entertainment" as a category of activities, distinct from "art," that government can regulate without regard to the First Amendment. Or to suppose--unless one is prepared to deprive most art of constitutional protection--that there is a rational conception of "expression" that places striptease dancing on the nonexpressive side of the divide.
 
 
 69
 4. If the line between the expressive and the nonexpressive is indistinct, the "line" between speech and conduct, between live performances and performances on paper, videotape, or compact disc, is a blur. (This case is a symphony of sterile dichotomies.) Normally, although not always, the medium in which experience is encoded is irrelevant to its expressive character and social consequences. The pitter-patter of raindrops does not become expressive activity by being recorded, and a recording of Beethoven's Ninth Symphony is not entitled to more constitutional protection than the live performance from which the recording was made. The government could not shut down the theaters on the ground that what actors do is conduct, not speech, with the result that a production of King Lear by the Royal Shakespeare Company would be outside the scope of the First Amendment but a nonobscene pornographic movie within it.
 
 
 70
 There are exceptions to the parity of the live and the canned performance. A murder intended as a political demonstration is illegal; a movie in which a murder is simulated is not. The reason is not that one is conduct and one speech, but that the conduct involved in the two performances is different. In the first, a person is killed; no one is killed or injured in the second. It is on this theory that child pornography, even if not legally obscene, can constitutionally be suppressed. New York v. Ferber, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); Osborne v. Ohio, --- U.S. ----, ---- - ----, 110 S.Ct. 1691, 1695-98, 109 L.Ed.2d 98 (1990). Speech is suppressed in order to get at the underlying conduct, the employment of children to make pornography. So might a state prohibit photographs of sex acts performed by persons paid to perform them; speech would be suppressed to get at the underlying conduct, a variant of prostitution. People v. Freeman, 46 Cal.3d 419, 250 Cal.Rptr. 598, 758 P.2d 1128 (1988); State v. Kravitz, 14 Or.App. 243, 511 P.2d 844 (1973). The striptease dancers in our case are not children and are not engaging in sex acts, and although it might be possible to distinguish between live and canned nude dancing on the ground that in the former the dancers are accessible to the audience, Indiana has disclaimed any such distinction as a basis for upholding its statute.
 
 
 71
 The true reason I think for wanting to exclude striptease dancing from the protection of the First Amendment is not any of the lawyers' classification games that I have been discussing, such as expression versus nonexpression, ideas versus emotions, art versus entertainment, or speech versus conduct. It is a feeling that the proposition, "the First Amendment forbids the State of Indiana to require striptease dancers to cover their nipples," is ridiculous. It strikes judges as ridiculous in part because most of us are either middle-aged or elderly men, in part because we tend to be snooty about popular culture, in part because as public officials we have a natural tendency to think political expression more important than artistic expression, in part because we are Americans--which means that we have been raised in a culture in which puritanism, philistinism, and promiscuity are complexly and often incongruously interwoven--and in part because like all lawyers we are formalists who believe deep down that the words in statutes and the Constitutions mean what they say, and a striptease is not a speech. But the element of the ridiculous is not all on one side. Censorship of erotica is pretty ridiculous too. What kind of people make a career of checking to see whether the covering of a woman's nipples is fully opaque, as the statute requires? (These statutes are full of absurd locutions, such as: " 'Wholly or substantially exposed to public view,' as it pertains to breasts, shall mean...." Chattanooga Ord. No. 7420, Sec. 25-28.2(b), quoted in City of Chattanooga v. McCoy, supra, 645 S.W.2d at 401.) Most of us do not admire the Islamic clergy for their meticulous insistency on modesty in female dress. Many of us do not admire busybodies who want to bring the force of law down on the heads of adults whose harmless private pleasures the busybodies find revolting. The history of censorship is a history of folly and cruelty.
 
 
 72
 Some two-party transactions have effects on third parties, and these effects are a proper object of public concern. Nonobscene displays of nudity can have such effects. Piarowski v. Illinois Community College Dist. 515, 759 F.2d 625 (7th Cir.1985), held that a public college could move an offensive although not obscene artistic display to a more discreet location where the display would not thrust itself on the unwilling viewer. Indiana can forbid the Kitty Kat Lounge to display photographs of its nude dancers on its marquee. But it cannot ban the dancing itself (when performed indoors, and not visible from the street) without a stronger showing of justification than it has attempted. Indeed, it has attempted none--which brings me to the brief and argument of the State of Indiana.
 
 
 73
 The brief is four and one-half double-spaced pages in length, and is replete with grammatical and typographical errors. It contains no explanation of the evil at which the statute is aimed, and its analysis of the constitutional question is limited essentially to the following passage: "Entertainment which did not contain expressive content--e.g., cockfighting or bear-baiting--could presumably be regulate [sic ] or prohibited by the States. Entertainment per se is not protected; entertainment that is a form of expression is." It is not obvious, however, that just because people can be forbidden to incite animals to kill each other, striptease dancers can be forbidden to remove all their clothing. There is a missing link between blood sports and erotic dancing that the brief does not attempt to supply. A psychiatrist might find the juxtaposition fascinating.
 
 
 74
 Asked at argument to explain the concern behind the statute--a pertinent question because there is no legislative history, and the Indiana decisions interpreting the statute do not explain its purpose beyond vague references to public decency--the state's lawyer first suggested that the purpose might be the protection of marriage. But recalling the divorce rate in this country he quickly added that that battle had already been lost and he switched his ground to the prevention of adultery. This is far-fetched and was not elaborated.
 
 
 75
 A related and more plausible concern that may lurk behind the statute is fear that striptease dancing in bars stimulates or facilitates prostitution. (Is the Kitty Kat Lounge in the red-light district of South Bend? Does South Bend have a red-light district? The record is silent on these questions.) The association between erotic dancing and prostitution goes back to Roman times; bump-and-grind dancing is said to have originated in the bordellos of the Wild West; and in California v. La Rue, 409 U.S. 109, 111, 93 S.Ct. 390, 393, 34 L.Ed.2d 342 (1972), the Supreme Court, in upholding under the Twenty-First Amendment a California statute restricting nude dancing, cited evidence that nude dancing in California bars had encouraged prostitution and other lewd conduct. See also United States v. Muskovsky, 863 F.2d 1319, 1321 (7th Cir.1988); Grand Faloon Tavern, Inc. v. Wicker, 670 F.2d 943, 950-51 (11th Cir.1982). The State of Indiana has never mentioned this evidence, however, let alone presented its own. Anyway the Indiana statute is not confined to bars. Although thus far I have discussed only the dancing at the Kitty Kat Lounge, because that is the only dancing that was videotaped for this case, the other plaintiff, Glen Theatres, owns a theater rather than a bar. The statute has been held to apply to theaters as well. Erhardt v. State, 468 N.E.2d 224 (Ind.1984), reversing 463 N.E.2d 1121 (Ind.App.1984). If it were confined to establishments where liquor is sold, Indiana could appeal to the broad regulatory powers that states enjoy by virtue of section 2 of the Twenty-First Amendment, which forbids the transportation of alcoholic beverages into any state in violation of the state's laws. California v. La Rue, supra; New York State Liquor Authority v. Bellanca, 452 U.S. 714, 101 S.Ct. 2599, 69 L.Ed.2d 357 (1981) (per curiam); Reed v. Village of Shorewood, supra, 704 F.2d at 950-51. The Supreme Court of North Dakota relied on that amendment in upholding an ordinance forbidding all dancing in places where liquor is served. Olson v. City of West Fargo, 305 N.W.2d 821, 827 (N.Dak.1981).
 
 
 76
 Why the Twenty-First Amendment, the aim of which was to repeal Prohibition without eliminating state authority over the sale of liquor, should be thought to curtail the scope of the First Amendment is an abiding mystery of constitutional interpretation. The question is foreclosed at our level of the judiciary, however, and may in any event have little practical significance. For even if there were no Twenty-First Amendment, government would have greater scope for regulating expressive activity in bars than in theaters without violating the First Amendment. The audience is smaller, attentiveness is less, the expressive element diluted, and in short the social costs of restriction are lower. There are indications that the Supreme Court would be receptive to a ruled based on such distinctions, California v. La Rue, supra, 409 U.S. at 118, 93 S.Ct. at 397; New York State Liquor Authority v. Bellanca, supra, 452 U.S. at 722-23, 101 S.Ct. at 2603-04 (Stevens, J., dissenting), despite the social, cultural, and even political importance of cabaret entertainment. Segel, Turn-of-the-Century Cabaret (1987). And while in one sense the Indiana statute imposes an outright ban on an expressive activity rather than merely regulating it, in another sense the statute is a mere, and indeed modest (pun intended), regulation. The statute does not ban striptease dancing; it bans only striptease dancing that ends in nudity, which is so narrowly defined that a woman wearing only tiny "pasties" and a G-string is considered clothed. So perhaps it is merely the manner of the striptease that is being regulated, and regulations of the time, place, and manner of expressive activity are treated more leniently than outright bans.
 
 
 77
 But set to one side this question of which pigeonhole to put the statute in; it is another example of the frequent sterility of efforts at legal classification. Cf. Community for Creative Non-Violence v. Turner, 893 F.2d 1387, 1398-99 (D.C.Cir.1990) (concurring opinion). Instead consider the issue in functional terms. The incremental expression associated with the movement from practical nudity to statutory nudity may well be slight, and the association of nude barroom dancing with prostitution may be a good enough reason for outlawing that increment to tip the balance in favor of a rule prohibiting nude dancing in bars but not in theaters, where the performers do not mingle with the customers. But that is not the approach of the Indiana statute. The statute does not distinguish between bars and theaters, and this omission, taken with the failure of the state in its briefs or at argument to mention prostitution, should make one skeptical that anxiety about prostitution is what animates it. Moreover, it is the striptease itself that the district judge found not to be expressive activity, not just the final step of baring all. I add that despite the appeal of incremental analysis in this as in other settings, it would violate the First Amendment to require museums to place figleaves and brassieres on their paintings and statues. Perhaps the Indiana statute effects a parallel mutilation of striptease dancing.
 
 
 78
 If we were dealing with a local ordinance, or a state statute authorizing local ordinances, the case for regulation would be strengthened. Even if one accepts the current view that the Fourteenth Amendment makes the prohibitions of the First Amendment fully applicable to the states and its subdivisions, the geographical scope of a restriction on expressive activity bears on the reasonableness of the restriction. Prostitution is a local problem, so the case for banning nude dancing in bars in order to reduce the incidence of prostitution will be stronger or weaker depending on local conditions. Moreover, an ordinance is less restrictive than a statute. It not only affects fewer people (on average--for some cities are more populous than some states); it restricts them less. It is cheaper to travel to a nearby town for erotic entertainment than to another state.
 
 
 79
 In sum, while a local ordinance forbidding nude dancing and other nude performances in bars would be constitutionally unproblematic (nonexpressive public nudity in bars as in other places would fall under the legitimate ban of the state's statute) and would take care of the only social problem plausibly associated with nude dancing, a statewide ban on such dancing, applicable to theaters as well as to bars, violates the First Amendment. It is not saved by an exception for expressive dancing, when the exception excludes striptease dancing, which is expressive whether or not one likes what is being expressed. The intermediate regulation would be a statewide statute forbidding nude dancing (and other nude performances) in bars only; such a statute would be constitutional by virtue of the Twenty-First Amendment as it has been interpreted.
 
 
 80
 Can the application of the statute to dancing in theaters as well as in bars be saved by reference to the "general effect" of a regulation that restricts speech incidentally? United States v. Albertini, 472 U.S. 675, 688-89, 105 S.Ct. 2897, 2906-07, 86 L.Ed.2d 536 (1985). In Clark v. Community for Creative Non-Violence, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), the issue was the legality of a regulation of the National Park Service that forbade sleeping over in a number of the parks managed by the Service, including Lafayette Park in Washington, D.C., opposite the White House. No one questioned the validity of the regulation as such, but it was argued that the First Amendment forbade enforcing the regulation against a group that wanted to sleep over in Lafayette Park in order to make a symbolic statement about the problem of homeless people. The Supreme Court upheld the enforcement of the regulation even though in the particular case the balance between the values of expressive "speech" and those of cleanliness and order may well have inclined in favor of speech. The Park Service was not required to make an exception for the Community for Creative Non-Violence. Id. at 296-97, 104 S.Ct. at 3070-71. By analogy it can be argued that the State of Indiana is not required to make an exception to its ban on public nudity merely because the persons clamoring for the exception wish to employ nudity as an element of expressive activity.
 
 
 81
 Albertini and Clark make clear that persons engaged in expressive activity have no constitutional entitlement to be exempted from laws of general applicability. Authors cannot claim an exemption from income tax or publishers an exemption from the labor laws. This result is sound; and while it may be in tension with the principle derived from the free-exercise clause of the First Amendment that government must accommodate its laws of general applicability to the special needs of religious minorities, Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Hobbie v. Unemployment Appeals Comm'n, 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987); Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), that principle is moribund after Employment Division v. Smith, --- U.S. ----, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). But the teachings of Albertini and Clark are inapplicable here. The regulations involved in those cases did not ban a particular form of expressive activity across the board but merely excluded it from certain public property (military bases in Albertini, certain public parks in Clark ). And the harm to the policies behind the regulations was unaffected by the expressive character of the activities affected by them. In Clark for example, the damage to the parks was the same whether the sleepers were camping out for fun, were in fact homeless, or wished by sleeping in the park to make a symbolic statement on behalf of the homeless. In contrast, whatever interest Indiana is trying to safeguard by banning public displays of nudity is not harmed by theatrical--perhaps not even by nightclub--performances featuring nudity. The harm done to public order by a performance of Salome in which Salome ends the Dance of the Seven Veils clad only in a transparent body stocking and therefore nude under Indiana law--as in a performance last fall at the Lyric Opera in Chicago--is not of the same order of magnitude as the harm (in fright, disgust, or embarrassment), slight as it may be, caused by a person who runs down the middle of a busy street stark naked or urinates in an alley. Only in the latter cases does the concept of public decency supply a persuasive rationale for punishment.
 
 
 82
 The bearing of Albertini and Clark on the present case is in any event academic. The defendants have not attempted to defend the district court's decision on the ground that all that is involved here is a refusal by Indiana to make an exception to a general prohibition of public nudity; they have not cited Albertini or Clark; they have waived the point. We can with propriety affirm a district court's decision "on any ground that the record fairly supports and the appellee has not waived," Martinez v. United Automobile Workers, 772 F.2d 348, 353 (7th Cir.1985); LaSalle National Bank v. General Mills Restaurant Group, Inc., 854 F.2d 1050, 1052 (7th Cir.1988), but the second condition is not satisfied here. "A point raised for the first time at oral argument, when the appellant is in no position to reply, comes too late. We do not allow an appellant to raise new issues in the reply brief; perforce the appellee may not raise new issues at oral argument." United States v. Rodriguez, 888 F.2d 519, 524 (7th Cir.1989) (citation omitted). The appellees here never raised the issue.
 
 
 83
 Furthermore, whether or not required to do so by the First Amendment, Indiana has carved an exception to its public-decency statute for expressive activity. By interpreting the exception narrowly and thus the statute broadly, the district judge made the statute discriminate against a particular form of expressive activity--the "low" form represented by striptease dancing. And this a state surely cannot do without a reason.
 
 
 84
 The points about waiver and about the state's interpretation of the statute are connected. We are not the authoritative interpreters of a state statute; the state is. The state supreme court, in Baysinger, and the state's highest law enforcement official, in this case, concur in interpreting the statute not as a blanket prohibition of public nudity (an interpretation that the words of the statute would support), but as a prohibition of nonexpressive public nudity. That interpretation binds us, and demonstrates that what the state is doing is singling out a particular form of erotic but not obscene nude performance for condemnation. We would be inconsistent in affirming the district court's decision out of respect for popular preferences and states' rights while disregarding the meaning imprinted on the statute by the state's judges and law enforcement officials.
 
 
 85
 At oral argument the lawyer for the state said that the statute applies not only to live performances whether in theaters or in bars but also to movies with nude scenes, unless of course the movie is "expressive" in the sense in which "established" works of art are expressive. (Owners of movie theaters in Indiana, beware!) He added that if the strippers ended their dances in bathing suits rather than in the buff, this would not affect the First Amendment issue, because the striptease would still be mere conduct. This statute would not apply, because a woman in a bathing suit is not within the statute's definition of nudity; but the statute could be amended to take her in without violating the First Amendment. (So we could have morals police patrolling the streets of South Bend with knouts, like the Saudis.) Belly dancing, he added, could be banned, presumably on the same theory--it is not certified high art. He reassured us that the nude paintings that hang in museums are safe, although he would acknowledge only a limited acquaintance with such museums. Recent events in a state bordering on Indiana make one wonder how safe even museums will be if the spirit of censorship is allowed to flourish.
 
 
 86
 I do not argue that legislation, to be valid, must have some empirical basis or serve some utilitarian end. The modern state is not forbidden to interfere with transactions between consenting, competent adults merely because it is unable to show that third parties are harmed. The state is free to embody in legislation the moral opinions of its dominant groups, or for that matter of any group influential with the legislature--is free, therefore, to make hostility to nonmarital sex, disgust at public displays of nudity, revulsion at vulgar erotic entertainment, and embarrassment at public displays of nudity premises of state action even though it is difficult to ground these moralistic emotions in pragmatic social concerns. Anxiety about nudity has deep roots in Christian thought, Brown, The Body and Society: Men, Women and Sexual Renunciation in Early Christianity 249, 437-38 (1988), and the roots of our culture are Christian. Hostility to public nudity may even be connected with concepts of dignity and equality that are central to our political and social institutions. Id. at 316-17. But the state is free to act upon the moral preferences of the majority only up to the limits set by the federal Constitution. Those limits are not the sky when the activity restricted by state legislation is expressive activity in a sense that I believe encompasses erotic dance performances in general and the striptease in particular. The state can forbid nude dancing in bars if it acts under the Twenty-First Amendment, but if as here it wants to restrict such activity in all public establishments, whether or not they serve liquor, it needs a reason. Krueger v. City of Pensacola, 759 F.2d 851, 855-56 (11th Cir.1985). It has offered none. Cf. Mickens v. City of Kodiak, 640 P.2d 818 (Ala.1982).
 
 
 87
 Indiana's law enforcement authorities have been backed into an untenable position by the glosses that the courts of Indiana have placed on the statute, and are signaling to us by carefree advocacy their indifference to whether the statute survives or is struck down. (I think that is what they are doing, but I may be mistaken; the state did, after all, go to the bother of asking the full court to rehear the case.) In the America of 1990 the project of stamping out nude striptease dancing is quixotic. The power of government is relative to the desires and values of its people. The State of Indiana cannot take the erotic edge off American culture. I doubt that it is even trying to do so. But the sincerity of its concerns is easily tested. If the state is seriously concerned with the social consequences of nude barroom dancing, and does not trust its municipalities to deal adequately with the problem, it will amend its public-indecency statute to prohibit nude dancing in establishments that serve liquor. Such an amendment would be valid by virtue of the Twenty-First Amendment and would moot the questions that divide this court.
 
 
 88
 COFFEY, Circuit Judge, dissenting.
 
 
 89
 The majority holds that the First Amendment forbids the State of Indiana from applying its prohibition on public nudity to nude dancing since "Indiana's attempt to ban nude dancing in pursuit of its [interest in public morality] is a forbidden interference and restraint because it seeks to withdraw this non-obscene and protected communication from the realm of public discourse." Majority Opinion at 1088. The majority reaches this result in spite of the fact that the plaintiff dancers made a clear and unambiguous statement that they were not attempting to convey either "a larger political or ideological statement" and furthermore the district court made a specific finding that the dancers' conduct was "not expressive activity." Further, as the majority admits, a state may "regulate expressive conduct for reasons unrelated to the suppression of speech," Majority Opinion at 1088, and "may establish reasonable time, place and manner restrictions on protected expression." Id. The Indiana public nudity statute's application to the plaintiffs' nude dancing, like its application to any other form of public nudity, implements the state's interest in public morality, a legitimate and praiseworthy goal unrelated to speech and constitutes a valid regulation of the manner of any speech that allegedly inheres in the plaintiffs' nude dancing. I dissent.
 
 
 90
 Through the analytical vehicle of the "living constitution," the judiciary has all too frequently permitted the favored "rights" of particular individuals and groups to override a legislative majority's expression of the common good. Our society has evolved from one espousing strict moral standards to a rather uninhibited one. Under the flag of social and sexual individual freedom, advocates of such causes as the sexual revolution have utilized the judicial system to implement their Freudian vision of a society delivered from the legacy of repressed sexuality. Alleged First Amendment rights to the production and dissemination of sexually oriented tapes and books as well as substantive due process rights in the area of abortion, one of the most politically divisive questions of our time, are a few of the currently recognized "constitutional" rights that would have proven very difficult to obtain through the popularly elected legislative branch. These developments certainly have led to the progressive disruption of the basic moral tenets that have held our communities together for centuries. Unsuccessful efforts at judicial expansion of constitutional rights, such as the failed attempt to erect a constitutional right to homosexual sodomy in Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), testify to the persistent attempts to make use of the judiciary and the device of a "living constitution" to create a moral structure at odds with our Judaeo-Christian heritage. Indeed, an observer can discern from Justice Blackmun's dissent in Hardwick an attempt to develop a theoretical constitutional right "independently to define one's identity"[1] that would have, in essence, forbidden legislative action on any moral issue that could loosely be characterized as "victimless" (involving no clearly established damage to persons other than those who engaged in the activity). As the Supreme Court properly observed in rejecting this type of expansive jurisprudence in its majority opinion in Bowers: "The Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution." 478 U.S. at 194, 106 S.Ct. at 2846. Obviously, the framers of the Constitution and of the post-Civil War constitutional amendments never contemplated the type of "living" interpretation this document has received, including the present attempted recognition of constitutional protection for nude dancing. These individuals, who came from eras in which persons were fully clothed in public, certainly never contemplated, much less even dreamed, that the Constitution might someday be utilized as an instrument to promote nude dancing. What they had in mind when they left England for this country was the protection of religious exercise, freedom of press and debate, not the expansion of a so-called "living constitution" to create a climate of moral permissiveness.
 
 
 91
 I am not one of those who believes that it is the role of the federal courts, through the creation of a "living constitution," to, in effect, establish a secular moral view that contributes to the piece-by-piece dismantling of our historic Judaeo-Christian principles and heritage. Expansive constitutional interpretation, centering upon the issue of expression in a case where the plaintiffs have disavowed any intention to communicate a "larger political or ideological statement" must not become a tool for a federal court to substitute the moral views of a more vocal minority for those of the majority of the people of the State of Indiana acting through their democratically elected representatives. If at all possible, the courts should give effect to the will of the people, even when it means upholding laws that express moral viewpoints that reflect a conception of the common good that may not be shared by segments of a vocal, so-called intellectual minority. This fact was most emphatically recognized in Chief Justice Rehnquist's opinion in Webster v. Reproductive Health Services, --- U.S. ----, 109 S.Ct. 3040, 3058, 106 L.Ed.2d 410 (1989), where the Supreme Court considered the legitimacy of state legislation pertinent to abortion, one of the significant issues of our day:
 
 
 92
 "The dissent ... accuses us, inter alia, of cowardice and illegitimacy in dealing with 'the most politically divisive domestic legal issue of our time.' There is no doubt that our holding today will allow some governmental regulation of abortion that would have been prohibited under the language of cases such as Colautti v. Franklin, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979), and Akron v. Akron Center for Reproductive Health, Inc., supra [462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) ]. But the goal of constitutional adjudication is surely not to remove inexorably 'politically divisive' issues from the ambit of the legislative process, whereby the people through their elected representatives deal with matters of concern to them. The goal of constitutional adjudication is to hold true the balance between that which the Constitution puts beyond the reach of the democratic process and that which it does not. We think we have done that today. The dissent's suggestion that legislative bodies, in a Nation where more than half of our population is women, will treat our decision today as an invitation to enact abortion regulation reminiscent of the dark ages not only misreads our views but does scant justice to those who serve in such bodies and the people who elect them."
 
 
 93
 (Citations omitted).
 
 
 94
 I agree with the description of the judiciary's proper role expressed in Chief Justice Rehnquist's opinion. In the context of nude dancing, no less than in the contexts of abortion and other important questions of present concern, we are required to permit the people of each state to establish, through their democratically elected representatives, the moral climate in which they choose to live and raise their children. A state might well prefer a lifestyle that tolerates and perhaps even welcomes public nudity such as the likes of Las Vegas, San Francisco and others. So be it. People who seek this lifestyle are free to live in areas that cater to this moral climate. But many states, such as the State of Indiana, obviously wish a more wholesome lifestyle. If it so chooses, that state, through its duly elected representatives, should be entitled to create a cultural, ethical and moral environment above that which panders to the basest sexual appetites of human beings. Their right to select this type of environment should not be infringed upon, just as we would not infringe upon the right of other states to choose a more permissive environment. Community standards are a recognized part of the determination of whether dance is considered obscene and unprotected under the First Amendment. See Miller v. California, 413 U.S. 15, 24, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973) ("The guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest...."). They would seem no less relevant to the issue of the legitimacy of restrictions on conduct unrelated to speech (i.e., nudity). Accordingly, it is important that we recognize that states and local communities through their legislative bodies are responsible for the establishment of moral standards that reflect their conception of the common good. It is not our role to elevate the interests of a few individuals, thereby stifling the will of the majority. For example, in Ward v. Rock Against Racism, --- U.S. ----, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), the Court recognized the need to balance the interests of park users desiring highly amplified sound and park users who did not, rather than simply elevating the constitutional interests of the few over those of the majority, stating: "The City enjoys a substantial interest in ensuring the ability of its citizens to enjoy whatever benefits the city parks may offer, from amplified music to silent meditation." Ward, 109 S.Ct. at 2757. Similarly, in upholding the strong interest of the majority of the people of Ohio in eradicating child pornography, the Supreme Court held that: "Given the gravity of the State's interests in this context, we find that Ohio may constitutionally proscribe the possession and viewing of child pornography," Osborne v. Ohio, --- U.S. ----, ----, 110 S.Ct. 1691, 1697, 109 L.Ed.2d 98 (1990), and noted that this action was distinguishable from its earlier decision in Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), that recognized a right to privately possess adult, rather than child, pornography and obscene materials because Stanley itself recognized that " 'compelling reasons may exist for overriding the right of the individual to possess [certain statutorily prohibited] materials.' " Osborne, --- U.S. at ----, 110 S.Ct. at 1695 (quoting Stanley, 394 U.S. at 568 n. 11, 89 S.Ct. at 1249 n. 11).[2]
 
 
 95
 It is self-evident that Indiana's public nudity statute is motivated by that state's legitimate concern for public morality. Both the majority opinion and Judge Posner's concurrence complain of the absence of legislative history accompanying the passage of the statute. See Majority Opinion at 1088 ("Regrettably, Indiana does not record the legislative history of its statutes"); Posner concurrence at 1100 ("Asked at argument to explain the concern behind the statute--a pertinent question because there is no legislative history...."). But resort to legislative history to determine a legislature's intent in enacting a statute is unnecessary when the intent is clear from the statute's terms. As we recently stated in Trustees of Iron Workers Local 473, Pension Trust v. Allied Products Corp., 872 F.2d 208, 213 (7th Cir.1989):
 
 
 96
 "The resort to legislative history was unnecessary ... because the statute is clear and unambiguous. See Blum v. Stenson, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984) (where 'resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear').... [T]he clear language should be the guide to congressional intent. Discarding the plain language of a statute in favor of committee reports or other legislative history ignores the realities of the legislative process. The crafting of specific language often reflects legislative compromise reached after hard fought battles over the means to reach even common goals. Courts should only reluctantly turn to legislative history for fear of upsetting the delicate balance reflected in a finally worded piece of legislation. In this case 'the plain language' of the statute 'is the best evidence of its meaning.' Meredith [v. Bowen, 833 F.2d 650, 654 (7th Cir.1987) ]."
 
 
 97
 (Citations and footnote omitted, emphasis added).
 
 
 98
 The fact that public morality underlies Indiana's enactment of a public nudity statute is abundantly clear from the very language of the statute. For thousands of years people in Western cultures have consistently worn clothing in public, even from the time Adam and Eve wore the first fig leaves or loin cloths. It should not come as a shock that the sincerely held, traditional moral beliefs of the people of Indiana, would result in the enactment of a statutory requirement providing that at least a minimal amount of clothing be worn in public. Indeed, no fewer than 37 states have similar laws that prohibit indecent or lewd exposure of particular body parts.
 
 
 99
 Not only is the interest in public morality the self-evident basis for Indiana's public nudity statute, it is also an interest the Supreme Court has recognized as a legitimate justification for state regulation of conduct. For example, in Bowers v. Hardwick, 478 U.S. 186, 196, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986), the Supreme Court rejected the notion that traditional interests in public morality were insufficient to justify a state's prohibition of homosexual sodomy. The Court observed:
 
 
 100
 "[R]espondent asserts that there must be a rational basis for the law [against sodomy] and that there is none in this case other than the presumed belief of a majority of the electorate in Georgia that homosexual sodomy is immoral and unacceptable. This is said to be an inadequate rationale to support the law. The law, however, is constantly based on notions of morality, and if all laws representing essentially moral choices are to be invalidated under the Due Process Clause, the courts will be very busy indeed. Even respondent makes no such claim, but insists that majority sentiments about the morality of homosexuality should be declared inadequate. We do not agree, and are unpersuaded that the sodomy laws of some 25 states should be invalidated on this basis."
 
 
 101
 Bowers, 478 U.S. at 196, 106 S.Ct. at 2846 (footnote omitted, emphasis added). Similarly, Chief Justice Burger, in his concurrence in Bowers emphasized the legitimacy of traditional moral concepts as a basis for state regulation:
 
 
 102
 "[T]he proscriptions against sodomy have very 'ancient roots.' Decisions of individuals relating to homosexual conduct have been subject to state intervention throughout the history of Western civilization. Condemnation of those practices is firmly rooted in Judaeo-Christian moral and ethical standards.... To hold that the act of homosexual sodomy is somehow protected as a fundamental right would be to cast aside millenia of moral teaching.
 
 
 103
 This is essentially not a question of personal 'preferences' but rather of the legislative authority of the State. I find nothing in the Constitution depriving a State of the power to enact the statute challenged here."
 
 
 104
 Bowers, 478 U.S. at 196, 197, 106 S.Ct. at 2846, 2847 (Burger, C.J., concurring) (emphasis added).[3]
 
 
 105
 As well as improperly failing to recognize the legitimacy of Indiana's interest in public morality, the discussions of the state interest in "public morality" found in both the majority opinion and Judge Posner's concurrence demonstrate an inappropriately limited conception of this legitimate state interest. In belittling Indiana's interest in "public morality" Judge Posner states: "Many of us do not admire busybodies who want to bring the force of law down on the heads of adults whose harmless private pleasures the busybodies find revolting." Posner concurrence at 1100. Judge Posner's statement merely reflects differences in moral values among the population. Conduct that a more vocal minority considers to be the work of "busybodies" reflects the implementation of the less vocal majority's deeply held concerns and should be respected. Personally, I do not mind being labeled a "busybody" or a "prude" as I write to uphold the moral ethics, ideals and principles of the majority of the people of the State of Indiana speaking through their legislative representatives. In writing along these lines, I would add that neither others nor myself are paternalistic or wish to force our moral beliefs on society. We merely recognize the right of the people, and in this instance the populace, of the State of Indiana to implement their beliefs and conceptions of proper moral principles through their legislature. This right I believe must be respected.
 
 
 106
 Furthermore, when a state bars public nudity, including nude dancing, on the basis of its concern for public morality, it does not act as a "busybody." Rather, it acts to eliminate the real harm that can result from permitting public nude dancing. The interest in public morality that Indiana relied upon to enact its public nudity statute is based on the simple truth that nudity, while appropriate and beautiful in some contexts may also prove deeply offensive and harmful in other contexts. An artist oftentimes finds it necessary in his or her profession to make use of a nude model, and nudity in that case is free from indecent connotations. Certainly, any form of nudity whose purpose and manifestation is the arousal of sexual fantasies among groups or in public lacks any qualification for social acceptance. Public nudity clearly breaks down the acceptable social norms that have evolved from our Judaeo-Christian foundation. Most importantly, a real consequence of nude dancing is the loss of human dignity for the female performer and sometimes even those who observe the performance. Traditional values and morals, as are expressed in Indiana's prohibitions of public nudity, far from being instruments of puritanical repression, are means for establishing complete and healthy integration of the human personality and thus preserve the dignity of each and every individual, the primary requirement for wholesome social interaction.
 
 
 107
 The clearest way in which nude dancing harms the performers, the audience and society in general is through the degradation of women that results from their treatment solely as objects for lustful male sexual passions and appetites. When a woman is stripped of her clothing in the presence of a throng of observing males, we undeniably underscore the notion that a woman exists solely for the sexual satisfaction of a controlling group of males. In American Booksellers Ass'n, Inc. v. Hudnut, 771 F.2d 323, 328-29 (7th Cir.1985), aff'd 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986), we noted the legitimacy of a city's concerns for the dignified treatment and respect for the female gender that motivated its adoption of anti-pornography legislation:
 
 
 108
 "Indianapolis justifies the ordinance on the ground that pornography affects thoughts. Men who see women depicted as subordinate are more likely to treat them so. Pornography is an aspect of dominance. It does not persuade people so much as change them. It works by socializing, by establishing the expected and the permissible. In this view pornography is not an idea; pornography is the injury.
 
 
 109
 There is much to this perspective. Beliefs are also facts. People often act in accordance with the images and patterns they find around them. People raised in a religion tend to accept the tenets of that religion, often without independent examination. People taught from birth that black people are fit only for slavery rarely rebelled against that creed; beliefs coupled with the self-interest of the masters established a social structure that inflicted great harm while enduring for centuries. Words and images act at the level of the subconscious before they persuade at the level of the conscious. Even the truth has little chance unless a statement fits within the framework of beliefs that may never have been subject to rational study.
 
 
 110
 Therefore, we accept the premises of this legislation. Depictions of subordination tend to perpetuate subordination. The subordinate status of women in turn leads to affront and lower pay at work, insult and injury at home, battery and rape on the streets. In the language of the legislature, '[p]ornography is central in creating and maintaining sex as a basis of discrimination. Pornography is a systematic practice of exploitation and subordination based on sex which differentially harms women. The bigotry and contempt it produces, with the acts of aggression it fosters, harm women's opportunities for equality and rights [of all kinds].' IND.CODE Sec. 16-1(a)(2)."
 
 
 111
 (Footnotes omitted). Although we invalidated the Indianapolis legislation involved in Hudnut on the basis of viewpoint discrimination, 771 F.2d at 325, there was a clear recognition that the government's concern for the degrading effects pornography has upon women was a legitimate and proper basis for legislative action. This recognition was corroborated in the Final Report of the Attorney General's Commission on Pornography:
 
 
 112
 "An enormous amount of the most sexually explicit material available, as well as much of the material that is somewhat less sexually explicit, is material that we would characterize as 'degrading,' the term we use to encompass the undeniably linked characteristics of degradation, domination, subordination, and humiliation. The degradation we refer to is degradation of people, most often women, and here we are referring to material that, although not violent, depicts people, usually women, as existing solely for the sexual satisfaction of others, usually men, or that depicts people, usually women, in decidedly subordinate roles in their sexual relations with others, or that depicts people engaged in sexual practices that would to most people be considered humiliating. Indeed, forms of degradation represent the largely predominant proportion of commercially available pornography."[4]
 
 
 113
 In the related area of child pornography, the Supreme Court has recently observed that: " 'The legislative judgment, as well as the judgment found in the relevant literature, is that the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child. That judgment, we think, easily passes muster under the First Amendment.' " Osborne v. Ohio, --- U.S. ----, ----, 110 S.Ct. 1691, 1695, 109 L.Ed.2d 98 (1990) (quoting New York v. Ferber, 458 U.S. 747, 758, 102 S.Ct. 3348, 3355, 73 L.Ed.2d 1113 (1982) (footnote omitted)). In light of the harm nude dancing causes to the female gender, including the psychological damage to performers that is so frequently a byproduct, I see no reason why the will of the people, expressed in the legislative branch, should not be permitted to prohibit this activity and overcome an alleged First Amendment right that is based on a foundation of quicksand.
 
 
 114
 In my view the state's interest in protecting the welfare of its populace, including but not limited to the female entertainers, through a ban on nude dancing is both analogous to and more significant than the state's interest in animal welfare (prevention of the "torture and killing of animals") that Judge Posner would hold sufficient for the government to ban the allegedly expressive activity of bullfighting. Judge Posner notes that:"In calling bullfighting 'expressive,' I may seem to be implying, despite my disclaimer, that bullfighting must be protected by the First Amendment from regulation or suppression; for does not the amendment protect freedom of expression? I repeat that I do not believe that the First Amendment protects bullfighting. But I insist that bullfighting is an expressive activity. To deny this would be to play the unedifying semantic game called persuasive definition. Bullfighting is forbidden not because it is not expressive, but because in American society its harmful consequences are thought to outweigh its expressive value."
 
 
 115
 Posner concurrence at 1097 (emphasis in original). In the same way, I believe that the degradation of women involved in nude dancing constitutes a "harmful consequence" of this activity that "outweigh[s] its expressive value" and would allow the state in its legislative wisdom to act "to destroy a market for the exploitative use of"[5] women.
 
 
 116
 Not only does nude dancing in and of itself degrade women, its elimination is particularly important because of its close association with a more devastating example of sexual exploitation of women, prostitution. The link between nude dancing, prostitution and other sexual crimes is well established. It is common knowledge that prostitution is a likely result in a situation where live performers sexually stimulate an audience and there often exists the probability of audience access to these performers for the performance of sexual activities. As Judge Posner notes: "The association between erotic dancing and prostitution goes back to Roman times [and] bump-and-grind dancing is said to have originated in the bordellos of the Wild West...." Posner concurrence at 1101. We need go no further than our own cases to discover that nude dancing and prostitution are partners coupled not only logically and historically but also in empirical, present-day reality. We can properly take judicial notice that in no fewer than three of our decisions in the past two years prostitution operations have been based in nude dancing establishments. See United States v. Marren, 890 F.2d 924, 926 (7th Cir.1989) ("Michael's Magic Touch served alcoholic beverages and entertained patrons with nude female dancers who, when not performing on stage, solicited the club's patrons to engage in sexual activities in rooms located above the club"); United States v. Doerr, 886 F.2d 944, 949 (7th Cir.1989) ("The prostitution activities ... were concentrated in three businesses that ... were nude dancing establishments...."); United States v. Muskovsky, 863 F.2d 1319, 1322 (7th Cir.1988) (Prostitution operation based in nude dancing establishment where customers were enticed to purchase "very expensive drinks ... in exchange for sexual favors"). See also 1 J. Weinstein and M. Berger, Weinstein's Evidence, p 200 and 200 (Setting forth requirements for taking judicial notice of "legislative facts"). Furthermore, in California v. LaRue, 409 U.S. 109, 111, 93 S.Ct. 390, 393, 34 L.Ed.2d 342 (1972), now Chief Justice Rehnquist described the prostitution and other sexual activities accompanying nude dancing that motivated a ban on nude dancing in California:
 
 
 117
 "Customers were found engaging in oral copulation with women entertainers; customers engaged in public masturbation; and customers placed rolled currency either directly into the vagina of a female entertainer, or on the bar in order that she might pick it up herself. Numerous other forms of contact between the mouths of male customers and the vaginal areas of female performers were reported to have occurred.
 
 
 118
 Prostitution occurred in and around such licensed premises, and involved some of the female dancers. Indecent exposure to young girls, attempted rape, rape itself, and assaults on police officers took place on or immediately adjacent to such premises."[6]
 
 
 119
 Thus, I agree with the observations of Justice Scalia that businesses, such as those that exhibit public nudity, are engaged in " 'the sordid business of pandering,' " FW/PBS, Inc. v. City of Dallas, --- U.S. ----, 110 S.Ct. 596, 622, 107 L.Ed.2d 603 (1990) (Scalia, J., dissenting) (quoting Ginzburg v. United States, 383 U.S. 463, 467, 86 S.Ct. 942, 945, 16 L.Ed.2d 31 (1966)), and that "[t]he Constitution does not require a State or municipality to permit a business that intentionally specializes in, and holds itself forth to the public as specializing in, ... live human nudity." Id. Although Judge Posner does not believe that the Indiana statute follows this approach, even he notes that:
 
 
 120
 "The incremental expression associated with the movement from practical nudity to statutory nudity may well be slight, and the association of nude barroom dancing with prostitution may be a good enough reason for outlawing that increment to tip the balance in favor of a rule prohibiting nude dancing in bars but not in theaters, where the performers do not mingle with the customers."
 
 
 121
 Posner concurrence at 1101. In any event, it is quite clear, even in the concurring judge's opinion, that a limitation on public nudity, applicable to nude dancing, could serve a legitimate and proper interest in public morality through its suppression of prostitution.
 
 
 122
 Nude dancing can also raise danger for innocent persons, particularly women, who often find themselves victimized by those who have witnessed such performances. Certainly there is a powerful state interest in preventing sexual assault. Nude dancing, through its excitation of male sexual passions, might very logically result in a sexual assault. The Attorney General's Commission on Pornography specifically noted a relationship between exposure to exhibitions or material that degraded women and rape and other forms of unwanted sexual aggression:
 
 
 123
 "[O]n the basis of all the evidence we have considered, from all sources, and on the basis of our own insights and experiences, we believe we are justified in drawing the following conclusion: Over a large enough sample a population that believes that many women like to be raped, that believes that sexual violence or sexual coercion is often desired or appropriate, and that believes that sex offenders are less responsible for their acts, will commit more acts of sexual violence or sexual coercion than would a population holding these beliefs to a lesser extent.
 
 
 124
 We should make clear what we have concluded here. We are not saying that everyone exposed to material of this type has his attitude about sexual violence changed. We are saying only that the evidence supports the conclusion that substantial exposure to degrading material increases the likelihood for an individual and the incidence over a large population that these attitudinal changes will occur. And we are not saying that everyone with these attitudes will commit an act of sexual violence or sexual coercion. We are saying that such attitudes will increase the likelihood for an individual and the incidence for a population that acts of sexual violence, sexual coercion, or unwanted sexual aggression will occur. Thus, we conclude that substantial exposure to material of this type bears some causal relationship to the level of sexual violence, sexual coercion, or unwanted sexual aggression in the population so exposed."
 
 
 125
 Attorney General's Commission on Pornography, U.S. Department of Justice, Final Report 333-34 (1986).
 
 
 126
 Although rape and other unwanted sexual attentions are the most direct manner in which uninvolved women may find themselves harmed from exhibitions of nude dancing, the vicious and deprecating attitudes toward women that are developed as a result of nude dancing have the effect of perpetuating many forms of improper discrimination against women. As the Attorney General's Commission on Pornography noted:
 
 
 127
 "We need mention as well that our focus on these more violent or more coercive forms of actual subordination of women should not diminish what we take to be a necessarily incorporated conclusion: Substantial exposure to materials of this type bears some causal relationship to the incidents of various non-violent forms of discrimination against or subordination of women in our society. To the extent that these materials create or reinforce the view that women's function is disproportionately to satisfy the sexual needs of men, then the material will have pervasive effects on the treatment of women in society far beyond the incidence of identifiable acts of rape or other sexual violence.... [W]e feel confident in concluding that the view of women as available for sexual domination is one cause of that discrimination, and we feel confident as well in concluding that degrading material bears a causal relationship to the view that women ought to subordinate their own desires and beings to the sexual satisfaction of men."
 
 
 128
 Attorney General's Commission on Pornography, U.S. Department of Justice, Final Report 334 (1986).
 
 
 129
 While public nudity, including nude dancing, offends public morality in each of the ways previously enumerated, it also can result in other significant harm to public morality. In addition to spawning sexually related crime, nude dancing establishments are frequently magnets for crime in general. The Attorney General's Commission on Pornography has noted:
 
 
 130
 "For many people the harms caused by pornography relate in part to the effects on communities and neighborhoods of the establishments in which such materials are commonly sold. Whether it be a peep show, an 'adults only' pornographic theater, or a so-called 'adult bookstore,' there seems widespread agreement that virtually all such establishments are largely detrimental to the neighborhoods in which they are located.... [S]uch establishments are likely to exist in close proximity to areas in which prostitution exists, and in close proximity to establishments such as bars featuring live sexually oriented entertainment. As a result, most people would consider such establishments environmentally detrimental, and there is some evidence indicating correlation between crime rates and the particular neighborhoods in which such establishments exist."
 
 
 131
 Attorney General's Commission on Pornography, U.S. Department of Justice, Final Report 385-86 (1986). Indeed, the Supreme Court has explicitly permitted zoning regulations impinging upon adult-oriented establishments because of this type of undesirable effect upon the neighborhoods in which they exist, holding that such an "ordinance represents a valid governmental response to the 'admittedly serious problems' created by adult theaters." City of Renton v. Playtime Theaters, Inc., 475 U.S. 41, 54, 106 S.Ct. 925, 932, 89 L.Ed.2d 29 (1986). Furthermore, in an era where sexually transmitted diseases such as Acquired Immunity Deficiency Syndrome (AIDS) are prevalent, it would seem apparent that nude dancing establishments, and their common side effects of prostitution and other sexually related crimes, would offend public morality and public health through their effect upon the incidence of fatal and near fatal sexually transmitted disease.
 
 
 132
 In his concurrence Judge Posner essentially argues that Indiana cannot rely upon the broad conception of public morality that I have just considered, because it failed to verbalize all of these interests in its briefs and oral arguments in the current litigation. I disagree. As we have just developed, a state's interest in public morality is a many faceted interest designed to protect the citizenry from the psychological and physical harm that can result from public nudity, including nude dancing. As we have also developed, a legislature's intent to rely upon this multi-faceted interest is obvious in the very passage of a statute barring public nudity. In particular, the relationship between nude dancing and prostitution is so common knowledge that it is unnecessary for the legislature to specifically mention this concern and the alleged lack of legislative history is hardly worthy of comment. There is no doubt that Indiana's attorneys would have little problem in spelling out the state's interest in public morality in greater detail before this court, a situation we frequently overlook under the guise of judicial economy. This same comment might very well be made concerning many advocates who appear before us. However, I am unconvinced that their failure to explain in minute detail every aspect of the broad concern for public morality that legitimately motivates a ban on public nudity, applicable to nude dancing, should require a holding that Indiana did not, in fact, rely upon such a broad conception of public morality. These concerns should be self-evident to an educated man or woman unless we are intent on creating a red herring. In this regard, I would note that the insistence upon detailed legislative expression of every reason for Indiana's public nudity statute is distinctly at odds with the use of the concept of a "living constitution" that clearly departs from the intention of the Founding Fathers. Certainly the Founders lived in a society where people generally remained fully clothed in public and would have never even dreamed that the constitutional right to freedom of expression included a freedom to dance unclothed in public. Yet, while there is a clear willingness to utilize the concept of a "living constitution" to permit any form of arguably expressive conduct to obtain First Amendment protection, there is a contrasting outright reluctance to give the same latitude to the interpretation of the legislature's interest in public morality. Because it is so obvious that clothing is normally required in a modern society, a state must not be required to undergo the time-wasting effort of explaining each and every self-evident reason why it is desirable to have the populace wear clothing in order for it to implement its interest in public morality through a prohibition on public nudity applicable to nude dancing.
 
 
 133
 I respectfully disagree with the majority's reply that the State's interest in public morality is insufficient to permit the application of the public nudity statute to the plaintiffs' nude dancing because the State's advancement of its interest in public morality "must operate within the proscriptions of the First Amendment," Majority Opinion at 1088, and "Indiana's attempt to ban nude dancing in pursuit of [this] interest is a forbidden interference and restraint because it seeks to withdraw this non-obscene and protected communication from the realm of public discourse." Id. (Footnote omitted).
 
 
 134
 We are concerned with an Indiana public nudity statute that has been declared valid on its face. State v. Baysinger, 272 Ind. 236, 397 N.E.2d 580 (1979), appeal dismissed for want of a substantial federal question, 446 U.S. 931, 100 S.Ct. 2146, 64 L.Ed.2d 783 (1980). In a previous opinion we recognized the Baysinger holding as authoritative for purposes of this litigation. Glen Theatre, Inc. v. Pearson, 802 F.2d 287, 288-90 (7th Cir.1986). Thus, this is an "as applied" challenge where we are concerned only with the statute's application to the plaintiffs' activities. Therefore, we must "limit our analysis of the constitutionality of the [statute] to the concrete case before us," Members of the City Council v. Taxpayers for Vincent, 466 U.S. 789, 803, 104 S.Ct. 2118, 2127, 80 L.Ed.2d 772 (1984), and speculation concerning whether or not the state might enforce this statute if the routines were "choreographed as part of a graduate Ph.D. thesis," Majority Opinion at 1086,[7] if the nudity was in a "movie," Posner concurrence at 1104, or in "belly dancing," Id., is simply irrelevant. I also am at a loss to understand the relevance in these proceedings of Judge Posner's complaints that a statute violates the Constitution when it impermissibly discriminates against "a particular form of erotic but not obscene nude performance." Posner concurrence at 1103. While all of these concerns might have been relevant to the earlier facial challenges to the public nudity statute, at this juncture of the litigation when we consider a challenge to the application of the statute to the conduct of these dancers we are concerned only with the statute's actual enforcement history. It is great to engage in academic speculation and theorizing about hypothetically possible applications of the public nudity statute that might or might not improperly restrict protected expression, but such speculation is inappropriate at this juncture of the litigation. Where, as here, the only concrete example of enforcement of the statute contained in the record involves the conduct of the plaintiffs, we are limited solely to consideration of whether their activities are constitutionally protected from the prohibition of public nudity contained in Indiana's facially valid statute. See Vincent, 466 U.S. at 803, 104 S.Ct. at 2127.[8]
 
 
 135
 I agree with Judge Easterbrook's dissent in Section I wherein he considers how the application of Indiana's public nudity law to the nude dancing present in this case constitutes a permissible regulation of allegedly expressive conduct for reasons unrelated to speech and properly concludes that "laws against public nudity apply even if someone wishes to use nudity as an input into an expressive performance." Easterbrook dissent at 1123. As explained hereafter, I also am convinced that Indiana's public nudity statute, which implements Indiana's legitimate interest in public morality, is a valid regulation of the dancer's conduct and of the manner of expression allegedly inherent in this activity.[9]
 
 
 136
 Indiana's public nudity statute is a restriction on the manner in which persons appear in public in the State of Indiana, applicable in public parks, streets and buildings, whether or not the involved individuals are engaged in allegedly expressive activity. The statute is similar to an indecent exposure prohibition and its very language makes clear that it is neither aimed toward nor limited to nude dancing, but rather prohibits nude dancing among other forms of indecent exposure such as "mooning," topless sunbathing, bottomless poetry recitation and any other activity, expressive or non-expressive, that results in public nudity. As even Judge Posner observes in his concurrence:
 
 
 137
 "The [public nudity] statute does not ban striptease dancing; it bans only striptease dancing that ends in nudity, which is so narrowly defined that a woman wearing only tiny 'pasties' and a G-string is considered clothed. So perhaps it is merely the manner of the striptease that is being regulated, and regulations of the time, place, and manner of expressive activity are treated more leniently than outright bans."
 
 
 138
 Posner concurrence at 1101 (emphasis in original). The Supreme Court has made clear that
 
 
 139
 "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.' "
 
 
 140
 Ward v. Rock Against Racism, --- U.S. ----, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) (emphasis added)).
 
 
 141
 In applying the legal test applicable to a time, place or manner regulation, we begin with the question of whether the State's application of its public nudity statute to the plaintiffs is content neutral. The Supreme Court has stated:
 
 
 142
 "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. Government regulation of expressive activity is content-neutral so long as it is 'justified without reference to the content of the regulated speech.' Community for Creative Non-Violence, supra, 468 U.S. at 293, 104 S.Ct. at 3069 (emphasis added)."
 
 
 143
 Ward, 109 S.Ct. at 2754 (citations omitted).
 
 
 144
 The majority asserts that Indiana's application of its public nudity statute in furtherance of its goal of promoting public morality is not content neutral because: "In meeting this intended goal [public morality], the statute directly restricts activity in the context of this case precisely because it expresses a particular message contrary to the legislature's prescribed vision." Majority Opinion at 1088, n. 7. The majority's statement is factually inaccurate because not one of the plaintiffs has ever asserted that her conduct was intended to convey any message, much less a message in opposition to the State of Indiana's vision of public morality. Section II-A of Judge Easterbrook's dissent effectively demonstrates that the district court determined that one dancer's true purpose was not to express any idea but "to try to get customers to like her so that they will buy more drinks later," while one other dancer featured an act with "no choreography," and was paid based upon "the number of drinks purchased." Easterbrook dissent at 1123. As the counsel for one of the dancers stated at oral argument, and as Judge Easterbrook notes in his dissent:
 
 
 145
 "[T]here is not a larger political or ideological statement being made. I do not contend for a second that this is true.... I do not contend that there is some idea being expressed. We have said that in keeping with the language of the United States Supreme Court in Schad, that entertainment as well as political and ideological speech enjoys First Amendment protection. That's all we have ever said."
 
 
 146
 Easterbrook dissent at 1123 (emphasis added). Indeed, the questionable nature of any constitutional protection for any form of nude dancing was emphasized in the Sixth Circuit's recent opinion in Wal-Juice Bar, Inc. v. Elliott, 899 F.2d 1502 (6th Cir.1990), where the court observed that "the outright ban of nude dancing permitted under [City of Newport v. Iacobucci, 479 U.S. 92, 107 S.Ct. 383, 93 L.Ed.2d 334 (1986) (per curiam) ] and [New York State Liquor Authority v. Bellanca, 452 U.S. 714, 101 S.Ct. 2599, 69 L.Ed.2d 357 (1981) (per curiam) ][10] rather plainly indicates that nude dancing is not a fundamental right entitled to heightened scrutiny under the due process clause." Wal-Juice Bar, 899 F.2d at 1507. This is a view that contrasts with that of the majority herein. The district court found that the dancers' conduct was "not expressive activity," and as I understand the law, we are bound to sustain district court findings of fact unless clearly erroneous. Federal Rule of Civil Procedure 52(a). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson v. City of Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985). Similarly, "[w]hen there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. at 574, 105 S.Ct. at 1512. Thus, in light of the plaintiffs' counsel's clear statement that they were not communicating "a larger political or ideological statement," and the trial court's finding that the dancers' conduct "was not expressive activity," I am at a loss to understand how the majority can elect to come under the ever expanding umbrella of the "living constitution," cast aside the "clearly erroneous" standard of review, reach the conclusion that the plaintiffs sought to convey a message that opposed Indiana's concept of public morality and create another new and glorious First Amendment protection.
 
 
 147
 In the final analysis, however, it does not matter whether or not the plaintiffs sought to convey a message of opposition to Indiana's concepts of public morality. Indiana's public nudity statute is intended solely to ensure that neither expressive nor non-expressive conduct violates public morality, an interest wholly unrelated to the suppression of speech. The State of Indiana does not seek to muzzle the message of disagreement with its moral vision. The plaintiffs remain free to express opinions or to perform dance movements that would reflect their opposition to Indiana's vision of public morality. All Indiana requires is that in expressing any message they desire to convey, the plaintiffs abide by a requirement of wearing a minimal amount of clothing and covering that must be obeyed by both those who express opinions favoring and those who express opinions opposing the State's interest in public morality.[11] The Supreme Court has recently decided that the First Amendment does not compel an exemption from generally applicable criminal laws (drug laws) that incidentally affect the exercise of a liberty (free exercise of religion) protected under the First Amendment. Employment Division, Oregon Department of Human Resources v. Smith, --- U.S. ----, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). As the Court noted, its "decisions have consistently held that the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' " Smith, --- U.S. at ----, 110 S.Ct. at 1599 (quoting United States v. Lee, 455 U.S. 252, 263 n. 3, 102 S.Ct. 1051, 1058 n. 3, 71 L.Ed.2d 127 (1982) (Stevens, J., concurring in judgment)). I am at a loss to be able to comprehend how the First Amendment provides a dancer's alleged exercise of a First Amendment right any greater freedom from generally applicable criminal laws than is enjoyed by an individual attempting to practice a First Amendment right to free exercise of religion. " ' "It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." ' " Osborne v. Ohio, --- U.S. ----, ----, 110 S.Ct. 1691, 1695, 109 L.Ed.2d 98 (1990) (quoting New York v. Ferber, 458 U.S. 747, 761-62, 102 S.Ct. 3348, 3356-57, 73 L.Ed.2d 1113 (1982) that quoted, in turn, Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498, 69 S.Ct. 684, 688, 93 L.Ed. 834 (1949)). Although Indiana's public nudity regulation may have "an incidental effect" upon persons who attempt to incorporate nudity into expressive conduct, an effect not felt by others who fail to incorporate nudity into their expression, this "incidental effect" is clearly justified by Indiana's proper and admirable concern for the promotion of public morality in contrast to the State of Wisconsin.[12] This is a legitimate interest unrelated to the suppression of speech.
 
 
 148
 If the majority's view of the legal theory of content neutrality was controlling law a state could never regulate the time, place or manner of speech to further an interest unrelated to the suppression of speech because any attempt to enforce such a restriction would constitute the suppression of a "particular message contrary to the legislature's prescribed vision." This becomes especially clear when the majority's interpretation of content neutrality is applied to the facts of two recent cases in which the Supreme Court upheld governmental time, place or manner regulations. When the majority's interpretation of content neutrality is applied to the facts in Ward v. Rock Against Racism, --- U.S. ----, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), a case where the Court held that the government's interest in a quiet park justified governmental restrictions on the volume of music performed in the park, the government's interest would be considered directly related to the suppression of speech because the musicians' loud music would express a message reflecting their opposition to this governmental interest. Similarly, when the majority's view of content neutrality is applied to Frisby v. Schultz, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), a case where the Court held that the government's interest in residential privacy justified a ban of targeted residential picketing, the government's interest would again be considered directly related to the suppression of speech because the picketers' expressive activity in the residential neighborhood expresses a message reflecting their opposition to this governmental interest. The Supreme Court's validation of the restrictions in both cases underscores the fallacious nature of the majority's interpretation of the concept of content neutrality.
 
 
 149
 Indiana's public nudity statute also "leave[s] open ample alternative channels of communication." Ward, 109 S.Ct. at 2753. The plaintiffs must only remain attired in the barest minimum of clothing during their dances, a requirement that hardly impedes the communication of the themes "of eroticism and sensuality"[13] that the majority believes are found in the plaintiffs' conduct. Complete nudity is not indispensable to the plaintiffs' supposed message of "eroticism and sensuality," because there are myriad ways in which plaintiffs could communicate their erotic and sensual theme while clad in the minimal attire the State of Indiana requires under its public nudity statute. Indeed, strippers wearing proper coverings have long conveyed the alleged message of "eroticism and sensuality," that the majority has divined in the plaintiffs' conduct. Thus, "ample alternative channels" remain for the communication of any message the plaintiffs arguably wish to convey, although I would again point out that the plaintiffs have clearly stated that they have no intention of conveying or expressing any political or ideological message.
 
 
 150
 It remains necessary to determine whether Indiana's application of its public nudity statute to the plaintiffs' conduct is "narrowly tailored to serve a significant governmental interest." Community for Creative Non-Violence, 468 U.S. at 293, 104 S.Ct. at 3069. In Frisby v. Schultz, 487 U.S. 474, 485-86, 108 S.Ct. 2495, 2502-03, 101 L.Ed.2d 420 (1988), the Supreme Court made clear that this constitutional requirement does not turn upon whether a statute "bans" or merely "regulates" particular expressive activity:
 
 
 151
 "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy. City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 808-810, 104 S.Ct. 2118, 2130-2132, 80 L.Ed.2d 772 (1984). A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil. For example, in Taxpayers for Vincent we upheld an ordinance that banned all signs on public property because the interest supporting the regulation, an esthetic interest in avoiding visual clutter and blight, rendered each sign an evil. Complete prohibition was necessary because 'the substantive evil--visual blight--[was] not merely a possible by-product of the activity, but [was] created by the medium of expression itself.' Id. at 810, 104 S.Ct. at 2131."
 
 
 152
 Whether Indiana's public nudity statute is viewed as an "attempt to ban nude dancing," Majority Opinion at 1088, or a mere attempt to regulate the nudity found in this alleged particular expressive activity,[14] the controlling question remains whether "each activity within the proscription's scope is an appropriately targeted evil." Frisby, 487 U.S. at 485, 108 S.Ct. at 2502. In Frisby the Supreme Court concluded that
 
 
 153
 "the 'evil' of targeted residential picketing, 'the very presence of an unwelcome visitor at the home,' Carey [v. Brown, 447 U.S. 455, 478, 100 S.Ct. 2286, 2299, 65 L.Ed.2d 263 (1980) ] (REHNQUIST, J., dissenting), is 'created by the medium of expression itself.' See Taxpayers for Vincent, 466 U.S. at 810, 104 S.Ct. at 2131. Accordingly, the Brookfield ordinance's complete ban of that particular medium of expression is narrowly tailored."
 
 
 154
 Frisby, 487 U.S. at 487-88, 108 S.Ct. at 2504. Similarly, in our case the relevant substantive evil, the damage to public morality resulting from the violation of Indiana's well drafted statute barring public nudity, is not "merely a possible byproduct" of the plaintiff's nude dancing, but is "created by the medium of expression [nude dancing] itself." See Taxpayers for Vincent, 466 U.S. at 810, 104 S.Ct. at 2131. Thus, in applying its public nudity statute to proscribe the plaintiffs' public nudity the State has "target[ed] and eliminate[d] no more than the exact source of the 'evil' it [sought] to remedy," Frisby, 487 U.S. at 485, 108 S.Ct. at 2502, and has thus regulated in a manner "narrowly tailored to serve a significant governmental interest." Community for Creative Non-Violence, 468 U.S. at 293, 104 S.Ct. at 3069.
 
 
 155
 The application of the Indiana public nudity statute to the plaintiffs' nude dancing activities, as well as to numerous other nude activities, is nothing more than a permissible regulation of the manner of any expression that is arguably contained in this conduct. Expression is hardly impeded where the plaintiffs have stated emphatically that they were not conveying a "larger political or ideological statement" and were merely attempting to entice customers to purchase drinks. "[N]ude dancing is not a fundamental right entitled to heightened scrutiny...." Wal-Juice Bar, 899 F.2d at 1507. Under no stretch of the imagination can the United States Constitution be considered to require an exemption to be carved from this statute to permit dancers in bars to flout the same prohibitions on public nudity that bind all others within the State of Indiana. I dissent and join Judge Manion's dissent as well as Sections I and III of Judge Easterbrook's dissent.
 
 
 156
 EASTERBROOK, Circuit Judge, with whom MANION and KANNE, Circuit Judges, join, and with whom COFFEY, Circuit Judge, joins with respect to Parts I and III, dissenting.
 
 
 157
 Our court brands as unconstitutional a state law forbidding anyone to "[a]ppear[ ] in a state of nudity" in a "public place". Ind.Code Sec. 35-46-4-1(a)(3). The Supreme Court has sustained the application of this statute to bars. State v. Baysinger, 272 Ind. 236, 397 N.E.2d 580 (1979), appeal dismissed for want of a substantial federal question, 446 U.S. 931, 100 S.Ct. 2146, 64 L.Ed.2d 783 (1980). The last time the case was here, we observed that Baysinger did not present a contention that barroom dancing is protected "expression", and we remanded so that the district judge could determine whether the dancers express something. 802 F.2d 287 (7th Cir.1986). He found that they do not. 695 F.Supp. 414 (N.D.Ind.1988). Today the court holds that expression is unnecessary, that all dance as entertainment is protected unless obscene.
 
 
 158
 * Indiana does not regulate dancing. It regulates public nudity. The difference is dispositive for constitutional purposes even if one accepts the majority's conclusion that dancing is speech (the subject of Part II below). Nudity is conduct. Laws regulating conduct may apply to expression without violating the First Amendment. Almost the entire domain of Indiana's statute is unrelated to expression, unless we view nude beaches and topless hot dog vendors as speech. Unclothed dancing is a tiny fraction of the ambit of the rule, and what plaintiffs need is an exemption from a well-justified norm.
 
 
 159
 Conduct that plays a role in expression is not exempt from neutral regulation. Persons sought to sleep in the park, see Clark v. Community for Creative Non-Violence, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (CCNV ), to convey a message about homelessness. Nonetheless, the Court held, the Park Service may apply its regulation forbidding camping. Regulation of conduct is acceptable if it furthers an important interest that is "unrelated to the suppression of free expression". United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). See also, e.g., FTC v. Superior Court Trial Lawyers Ass'n, --- U.S. ----, 110 S.Ct. 768, 778-79, 107 L.Ed.2d 851 (1990); United States v. Albertini, 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985). Burning a draft card in O'Brien, sleeping in CCNV, entering a military reservation in Albertini, boycotting criminal defense work in Superior Court Trial Lawyers, all were done to send a political message; although politics are the heart of the First Amendment, all of these messages were held subject to viewpoint-neutral regulation of the conduct. Cf. University of Pennsylvania v. EEOC, --- U.S. ----, 110 S.Ct. 577, 587-88, 107 L.Ed.2d 571 (1990) (EEOC may have access to university's tenure files under rules of general application notwithstanding possible burden on speech).
 
 
 160
 Indiana's reasons for prohibiting public nudity are "unrelated to the suppression of free expression". Its interest in attire is at least as great as the Park Service's interest in regulating catnaps, the subject of CCNV. Indiana need not prove that its interest in clothing is vital to welfare, or disprove the plaintiffs' assertion that an exemption for barroom dancing would be harmless: "The First Amendment does not bar application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception in the particular case will not threaten important governmental interests." Albertini, 472 U.S. at 688, 105 S.Ct. at 2906. The state's burden is especially light because the plaintiffs do not seek to transmit any message.
 
 
 161
 If Indiana forbade nudity only when employed in dance, then it would have a tough row to hoe. A dance-only law would be a regulation of expression if, as my colleagues believe, dance is speech. Regulation of expression faces high hurdles. The concurring opinion has things backwards in suggesting, concurring op. 1102, that a local law drawing a bead on nude dancing is easier to sustain than a state-wide ban on public nudity. If Indiana had targeted dancing, as the majority supposes, majority op. 1088 n. 7, I would be more sympathetic to its conclusion--although even then the state might have the power. States may prevent corporations from supporting candidates for public office, Austin v. Michigan Chamber of Commerce, --- U.S. ----, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990). Can it be that nude dancing at the corporation's tavern has greater constitutional protection than the firm's political speech?
 
 
 162
 But Indiana didn't try to clamp down on dancing because of what it expresses. Erotic dance occurs at plaintiffs' establishments daily, without hindrance from Indiana. The state bans public nudity and no more. Streakers, flashers, mooners, nymphs who want all-over tans, and models wearing see-through blouses at trade shows to attract attention to machine tools are subject to the same rules. The law has nothing to do with the expression or viewpoint of the undressed person. On the supposition that nude dancing is "speech", this is dispositive. Under CCNV, Superior Court Trial Lawyers, and like cases, the state need not justify failure to exclude nude dancing from its general law directed to public nudity.
 
 
 163
 The concurring opinion maintains, op. 1103, that Indiana's law is not neutral because the Supreme Court of Indiana held in Baysinger that the statute does not apply to speech. This approach would do away with the entire line of cases following O'Brien. A decision saying that a statute does not apply to protected expression recognizes the supremacy of the Constitution over state law; to acknowledge a limit the Constitution imposes on legislation is not to abandon the generality of the law. The rules concerning use of the parks at issue in CCNV had exceptions too; the Park Service did its best to accommodate expression, allowing the erection of symbolic tent cities, but drew the line at sleeping (which triggered the regulation forbidding "camping"). Government does not forfeit its entitlement to enforce laws regulating conduct by attempting to facilitate the expression of ideas.
 
 
 164
 Cases often say that regulation of conduct will be sustained when the governmental interest is sufficiently "important". Members of the majority say that Indiana's interest in clothing is tissue-thin. No case in the Supreme Court turns on a conclusion that the government's interest is inadequate. Whether judges should conduct such an inquiry at all when a neutral statute affects "expression" rather than "speech" is a question yet to be resolved. Judge Scalia's opinion in CCNV, which the Court cited approvingly in Texas v. Johnson, --- U.S. ----, 109 S.Ct. 2533, 2540, 105 L.Ed.2d 342 (1989), answers this question "no", and his assessment is persuasive.
 
 
 165
 I start from the premise that when the Constitution said "speech" it meant speech and not all forms of expression. Otherwise, it would have been unnecessary to address "freedom of the press" separately--or, for that matter, "freedom of assembly," which was obviously directed at facilitating expression. The effect of the speech and press guarantees is to provide special protection against all laws that impinge upon spoken or written communication (which I will, for the sake of simplicity, refer to generically as "speech") even if they do so for purposes that have nothing to do with communication, such as the suppression of noise or the elimination of litter. But to extend equivalent protection against laws that affect actions which happen to be conducted for the purpose of "making a point" is to stretch the Constitution not only beyond its meaning but beyond reason, and beyond the capacity of any legal system to accommodate.
 
 
 166
 The cases find within the First Amendment some protection for "expressive conduct" apart from spoken and written thought. The nature and effect of that protection, however, is quite different from the guarantee of freedom of speech narrowly speaking. It involves a significantly different balancing of private rights and public interests, and does not always call for the detailed "First Amendment analysis" characteristic of the speech cases.... Specifically, what might be termed the more generalized guarantee of freedom of expression makes the communicative nature of conduct an inadequate basis for singling out that conduct for proscription. A law directed at the communicative nature of conduct must, like a law directed at speech itself, be justified by the substantial showing of need that the First Amendment requires. But a law proscribing conduct for a reason having nothing to do with its communicative character need only meet the ordinary minimal requirements of the equal protection clause. In other words, the only "First Amendment analysis" applicable to laws that do not directly or indirectly impede speech is the threshold inquiry of whether the purpose of the law is to suppress communication. If not, that is the end of the matter so far as First Amendment guarantees are concerned; if so, the court then proceeds to determine whether there is a substantial justification for the proscription, just as it does in free-speech cases.
 
 
 167
 Thus, the First Amendment's protection of free speech invalidates laws that happen to inhibit speech even though they are directed at some other activity (sound amplification, campaign contributions, littering). The more limited guarantee of freedom of expression, by contrast, does not apply to accidental intrusion upon expressiveness but only to purposeful restraint of expression. It would not invalidate a law generally prohibiting the extension of limbs from the windows of moving vehicles; it would invalidate a law prohibiting only the extension of clenched fists.
 
 
 168
 Community for Creative Non-Violence v. Watt, 703 F.2d 586, 622-23 (D.C.Cir.1983) (en banc) (Scalia, J., dissenting) (emphasis in original, footnotes omitted), reversed, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).
 
 
 169
 Although the Court has not considered Judge Scalia's proposal for speech cases, it has adopted these views with respect to another part of the First Amendment, the Free Exercise Clause. Employment Division v. Smith, --- U.S. ----, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), holds that courts may not "balance" the public interest in the application of a statute neutral with respect to belief against the private party's interest in engaging in the forbidden activities. It wrote that the "government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, 'cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development.' " Id. at ----, 110 S.Ct. at 1603, quoting from Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 451, 108 S.Ct. 1319, 1326, 99 L.Ed.2d 534 (1988). Because the statute at hand forbade use of peyote without regard to smoker's motive, the Court held that there was no need even to consider how important the practice was to religion. Neutrality may not be a necessary condition of constitutionality, but it is a sufficient one.
 
 
 170
 So here. If we ask whether "the purpose of [Indiana's anti-nudity] law is to suppress communication", we must answer no. Ind.Code Sec. 35-45-4-1(a)(3) has nothing to do with speech, with expression, or with dancing--ballet, ballroom, or barroom varieties. It is indifferent to whether there is a message, or to the viewpoint expressed by any message. It prohibits public nudity, leaving speakers ample methods to convey thoughts of all kinds. Laws preventing prostitution (sex for money) apply even if someone wants to film the act and use it in protected expression, as laws against bank robbery and murder mean that producers of Bonnie and Clyde had to fake robberies and deaths rather than shoot real ones. See American Booksellers Ass'n v. Hudnut, 771 F.2d 323, 330, 332 (7th Cir.1985), affirmed, 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986). In the same fashion, laws against public nudity apply even if someone wishes to use nudity as an input into an expressive performance.
 
 
 171
 The concurring opinion observes, op. 1103, that Indiana did not rely on O'Brien, CCNV, Albertini, and similar cases. Usually that means waiver. The state loses its battle with Darlene Miller but retains the right to make its best arguments against other hoofers tomorrow. Yet neither the majority nor the concurrence grants the state this quarter. Both reject on the merits any possibility that Ind.Code Sec. 35-45-4-1(a)(3) is a neutral regulation of conduct. If we are to decide the O'Brien question rather than deem it waived, we should recognize that this line of cases vindicates Indiana's statute.
 
 II
 
 172
 The majority writes for the most part as if Indiana had a law that zeroed in on the salacious aspects of nude dancing. Even such a statute, however, would be within its constitutional powers, for dancing is not "speech".
 
 
 173
 * The court concludes that "non-obscene nude dancing performed as entertainment is expression and as such is entitled to limited protection under the first amendment", majority op. 1085. This dispenses with expression as an ingredient of speech, for the district judge found that there is no expression in these dances. With respect to plaintiff Miller, who dances at JR's Kitty Kat Lounge, the judge concluded:
 
 
 174
 When she dances, Ms. Miller perceives herself as "just entertaining, just dancing". The avowed purpose of her dance is to try to get customers to like her so that they will buy more drinks later.
 
 
 175
 Judge Sharp also adopted Judge Miller's findings concerning a similar act in the neighboring Ace-Hi Lounge:
 
 
 176
 Ms. Jacobs dances for fifteen to twenty minutes as a juke box plays four songs. She buys outfits to wear when she dances, but her act consists of removing the outfits. Her act features no choreography; she simply takes the stage and dances. Ms. Jacobs believes she entertains the patrons in the establishment: they come in to see her, they applaud, they buy her drinks in appreciation of her performance. Her pay depends upon the number of drinks purchased, and she must sell a certain number of drinks to be paid.
 
 
 177
 Although characterization in First Amendment cases is open to reexamination on appeal, Bose Corp. v. Consumers Union, 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984); Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 54, 91 S.Ct. 1811, 1825, 29 L.Ed.2d 296 (1971) (plurality opinion); American Jewish Congress v. Chicago, 827 F.2d 120, 129-30 (7th Cir.1987) (dissenting opinion), findings of historical fact must be respected. Especially when the parties agree that they are correct. Miller's lawyer conceded at oral argument that she was not trying to express anything. Counsel stated:
 
 
 178
 [T]here is not a larger political or ideological statement being made. I do not contend for a second that that is true.... I do not contend that there is some idea being expressed. We have said that in keeping with the language of the United States Supreme Court in Schad, that entertainment as well as political and ideological speech enjoys First Amendment protection. That's all we have ever said.
 
 
 179
 The court does not re-characterize the facts so much as say they are immaterial because dance is "inherently expressive" (maj. op. 1085). To the extent this means that professional choreography and staging are not essential, I agree. To the extent we ask what something is "inherently", rather than whether real people are trying to communicate, I part company with the court because it effectively holds that all purposive conduct is speech. "Although it is common to place the burden upon the Government to justify impingements on First Amendment interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive.... [W]e decline to deviate from the general rule that one seeking relief bears the burden of demonstrating that he is entitled to it." CCNV, 468 U.S. at 293 n. 5, 104 S.Ct. at 3069 n. 5.
 
 B
 
 180
 The First Amendment protects "the freedom of speech". Go-go dancing is not "speech". James Madison would have guffawed had anyone suggested public nudity as an example of "freedom of speech"--or of anything that could be derived from the Framers' conception by a series of plausible interpretations. Parading in a state of undress is conduct, not speech. Even Justices Black and Douglas, who thought the First Amendment absolute, rendering all efforts to curtail obscene speech unconstitutional, drew the line here. Dissenting in Roth v. United States, 354 U.S. 476, 512, 77 S.Ct. 1304, 1323, 1 L.Ed.2d 1498 (1957), Justice Douglas (joined by Justice Black) remarked: "I assume there is nothing in the Constitution which forbids Congress from using its power ... to proscribe conduct on the grounds of good morals. No one would suggest that the First Amendment permits nudity in public places, adultery, and other phases of sexual misconduct." (Emphasis in original.) What these absolutists gave as a reductio ad absurdum, the court today holds the First Amendment commands.
 
 
 181
 "Speech" is of course one form of conduct, the creation and dissemination of oral and written symbols. Other forms of conduct also convey ideas. So there is no bright line between conduct and speech, and laws regulating conduct may impede communication. What to do? The standard response is that "conduct" is treated as "speech" when it conveys a message, and regulation of this conduct fails when its application depends on that message. E.g., Johnson; Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). These are separate inquiries: first the conduct must be designed to express something, and second the law's effect must turn on the viewpoint expressed. Applying a law banning nudity to striptease dancing does not create problems on either branch. Part I showed that Indiana's rule does not depend on viewpoint. Much closer is the question whether the plaintiffs' dances express something, to which I turn.
 
 C
 
 182
 Communication is a subset of the universe of human behavior. "The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Roth, 354 U.S. at 484, 77 S.Ct. at 1308. "Speech" cannot be synonymous with purposive conduct, else the First Amendment means that "Congress shall make no law ... abridging the freedom of conduct"--or, for short, "Congress shall make no law".
 
 
 183
 My colleagues take a wrong turn in discussing works of art, pictures in books, and other forms of communication. These are not "conduct". Although the Framers drafted a rule to govern political speech, see Leonard W. Levy, Emergence of a Free Press (1985); Alexander Meikeljohn, Free Speech and its Relation to Self Government (1948), for a long time (and for good reasons) judges have equated political and frivolous books, paintings, music, and other works of the mind that have been committed to parchment (or canvas, or celluloid, or vinyl, or today pitted aluminum on plastic). Rock music, Penthouse magazine, and "slasher" movies are speech; we needn't ask whether they are conduct plus expression. One need not divine the message of a painting to separate the conduct from the speech; there is no "conduct" in it. In order to protect genuine speech from the censor, the definition of "obscenity" allows little room for regulation. Conduct may be regulated although not obscene. Our problem involves conduct, and to know whether to treat conduct as speech we must ask whether it shares the communicative aspect that led to the protection of real speech.
 
 
 184
 "In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.' " Johnson, 109 S.Ct. at 2539, quoting from Spence v. Washington, 418 U.S. 405, 410-11, 94 S.Ct. 2727, 2730-31, 41 L.Ed.2d 842 (1974). The district court found that the dancers are not trying to express an idea; the dancers agree. Our court does not say otherwise; it holds instead that a message is not necessary to expression because "eroticism and sensuality" (maj. op. 1086) automatically qualify as speech. Can other emotions be far behind? Despite the court's claim that its holding covers only "dance as entertainment", the majority does not identify any kind of entertainment that contains neither ideas nor emotions. Its rationale applies to entertainment en bloc.
 
 
 185
 Pervading this opinion is a belief that states may draw no lines where art is concerned. Sophisticates go to the museum and see Renoir's Olympia or to the opera and see a soprano strip during the Dance of the Seven Veils in Strauss' Salome. If the First Amendment protects these expressions, the argument goes, Joe Sixpack is entitled to see naked women gyrate in the pub. Maj. op. 1086, quoting from Salem Inn, Inc. v. Frank, 501 F.2d 18, 21 n. 3 (2d Cir.1974). Why does this follow? That a dance in Salome expresses something does not imply that a dance in JR's Kitty Kat Lounge expresses something, any more than the fact that Tolstoy's Anna Karenina was a stinging attack on the Russian social order implies that the scratching of an illiterate is likely to undermine the Tsar. Rembrandt applied paint to canvas; a bucket of paint hurled at a canvas also deposits paint. A conclusion that Rembrandt's paintings are speech would not imply that all paint is expressive. Juvenile delinquents who deface subway cars with spray paint may be "expressing themselves" in a colloquial sense, but they are not communicating ideas beyond their disdain for the sensibilities of others. The First Amendment does not let a government draw lines based on the viewpoint the performer expresses; it does inquire whether particular "entertainment" is "expression" in the first place. The Constitution does not protect "the freedom of entertainment". "Speech"--by implication "expression" of thoughts through conduct--is the foundation for its application.
 
 
 186
 Music is communicative or descriptive, and "as a form of expression and communication, is protected under the First Amendment." Ward v. Rock Against Racism, --- U.S. ----, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (emphasis added). Bach's Mass in B Minor, Beethoven's Pastoral (Sixth) Symphony, Wagner's Parsifal, Mahler's Resurrection (Second) Symphony, the Beatles' Sergeant Pepper's Lonely Hearts Club Band, like other vocal, religious, and program music, tell stories--sometimes sexually explicit ones, as in Orff's Carmina Burana, which, if it were not sung in Latin, could not be put on the airwaves. FCC v. Pacifica Foundation, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). People may fairly dispute whether absolute music, such as LaMonte Young's Well-Tuned Piano, communicates thoughts, but surely it embodies them (the right place for the major third, etc.); all that we call music is the product of rational human thought and appeals at least in part to the same faculties in others. It has the "capacity to appeal to the intellect", Ward, 109 S.Ct. at 2753, is not "conduct", and is closer to speech (even an emotional harangue is speech) than to smashing a Ming vase or kicking a cat, two other ways to express emotion.
 
 
 187
 Like mimes, ballets tell stories, often erotic stories, and clothing (or lack of it) may help the tale unfold. No one can miss the sensual message in Stravinsky's Le Sacre du Printemps or the fairy tale in Tchaikovsky's Nutcracker. Ballet rarely approaches absolute music in abstraction. Even Balanchine's choreography to Stravinsky's Agon, a model of spare movement, does not suppress the contest to which the title refers. People objected to Nijinsky and Isadora Duncan because of the message rather than the medium.
 
 
 188
 One could try reductionism, but it would fail. All music is rhythmic pressure on the eardrum. Mozart's string quartets, jackhammers, and humpback whales all produce rhythmic compressions. Yet Mozart's music is profound, jackhammers are the sound of progress but express nothing beyond what they do, and whale song, for all its haunting beauty, has only the message the listener supplies. Laws muffling jackhammers, or allowing the hunting of whales, do not violate the First Amendment.
 
 
 189
 To say that the line between barroom dancing and ballet is indistinct is not to say that no state may recognize the difference: "[W]e would poorly serve both the interests for which the State may validly seek vindication and the interests protected by the First and Fourteenth Amendments were we to insist that the sort of bacchanalian revelries [nude barroom dancing!] that the Department sought to prevent by these liquor regulations were the constitutional equivalent of a performance by a scantily clad ballet troupe in a theater." California v. LaRue, 409 U.S. 109, 118, 93 S.Ct. 390, 397, 34 L.Ed.2d 342 (1973). The line separating photos that are obscene from those the Constitution protects depends in part on whether the work, "taken as a whole, lacks serious literary, artistic, political or scientific value", Miller v. California, 413 U.S. 15, 24, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973). So the Court believes that the Constitution allows states to distinguish serious art from swill. Nude barroom dancing lacks "serious literary, artistic, political or scientific value". If it were real speech it would not be obscene (it is too mild to satisfy the rest of the Miller test), but the lack of "serious ... artistic ... value" assures us that Indiana is not squelching important aspects of culture.
 
 
 190
 Why is it important that the plaintiffs dance? The court uses a definition of dancing ("moving the body in a rhythmical way, usually to music", maj. op. at 1085) broad enough to cover most physical activity. Swimmers, roller skaters, ice skaters, walkers, skateboarders, matadors, and construction workers using jackhammers move rhythmically, often to music. The majority believes that "the communication of emotion or ideas" (ibid., emphasis added) is protected by the First Amendment. Many things other than dance, or entertainment, or dance-as-entertainment, express "emotion". Quarterbacks who throw touchdown passes exude emotion. Consistent application of the majority's approach prevents it from limiting constitutional protection to "dance as entertainment".
 
 
 191
 What of flashers, whose "message" scarcely differs from nude dancers'? Imagine an organized flasher, shucking his coat in a booth next to the hot dog vendor and adding a boom box and hip motions. This is "dance" as my colleagues use that word. If dance is "inherently" expressive then the flasher's act is speech; it can't matter that the display takes place outdoors, or that the customers gawk for free. Flashers affront an unwilling audience, yet speech is protected even when listeners are revolted, Cohen v. California, 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971). Courts holding that nude dance is protected speech when the dancers are indoors, and the customers pay to watch, but not otherwise, e.g., International Food & Beverage Systems v. Ft. Lauderdale, 794 F.2d 1520, 1525 (11th Cir.1986) (which the majority quotes approvingly at 1087), offer no principle by which "expression" turns on the existence of walls, or the solvency or approval of the audience. See Erznoznik v. Jacksonville, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (drive-in movie is protected speech despite fact that unwilling people see, and drivers may be distracted by, the images).
 
 
 192
 Barroom displays are to ballet as white noise is to music. We know that sexual congress is not protected by the First Amendment, whether offered to the public as entertainment, Paris Adult Theatre I v. Slaton, 413 U.S. 49, 67, 93 S.Ct. 2628, 2640, 37 L.Ed.2d 446 (1973), or sold in a spot market, Arcara v. Cloud Books, Inc., 478 U.S. 697, 705, 106 S.Ct. 3172, 3176, 92 L.Ed.2d 568 (1986). Sex may be entertaining and is at least as expressive as nude go-go dancing. Because the patrons do not fondle the dancers, our case is not Arcara, but this distinction is unrelated to expression. (Indeed, on the majority's view "lap dancing", a form of fondling, also might be protected speech, because it too expresses the joy of sex and involves "moving the body in a rhythmical way, usually to music".)
 
 
 193
 If the First Amendment covers entertainment, how ought we treat bullfighting, unlawful throughout this nation but popular in many others? The matador "entertains" no less than the stripper and "expresses" more. Bullfighting is a form of dance, with elaborate choreography and messages clearly perceived by the spectators. Indiana does not offer even a "time, place, and manner" for the sport. If it were to add baseball or checkers to the list of forbidden pleasures, or if Congress were to black out telecasts of football games when the stadiums do not sell out (it has), objections could not be based on the First Amendment.
 
 
 194
 No one can escape the bullfighting problem by saying that it involves cruelty to animals, which state laws forbid. E.g., Ind.Code Sec. 35-46-3-12(a)(1). That is not the only reason we forbid such spectacles. "Bearbaiting and cockfighting are prohibited only in part out of compassion for the suffering animals; the main reason they were abolished was because it was felt that they debased and brutalized the citizenry who flocked to witness such spectacles." Irving Kristol, On the Democratic Idea in America 33 (1972). One may say the same for striptease dancing. Anyway, the question is whether the matador is speaking--whether the First Amendment applies--not whether the state's claim to regulate surmounts that hurdle. Despite its refrain that the opinion is limited to dance as entertainment, the court's approach means that bullfighting is speech. If so, it is hard to see on what ground a state may forbid bullfighting. Speech is protected even when it produces risks to people, as in Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), and Hudnut, 771 F.2d at 328-30. I cannot accept a rationale implying that a state may muffle speech to promote the welfare of bulls but not to promote the welfare of blacks (Brandenburg ) or women (Hudnut ).
 
 D
 
 195
 We are told that however wide the gulf between striptease dancing and the Federalist Papers, the Rubicon was crossed in Schad v. Mt. Ephraim, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981). It wasn't. Schad dealt with a zoning ordinance that forbade all live entertainment. This barred the town gates to Dylan Thomas's Under Milkwood as well as to plays and other forms of speech. The Court held it overbroad. By dismissing the appeal in Baysinger, the Court has already held that Indiana's public nudity statute is not overbroad.
 
 
 196
 Although the laws have nothing in common, Schad contains language that has been taken to resolve the question before us.
 
 
 197
 By excluding live entertainment throughout the Borough, the Mount Ephraim ordinance prohibits a wide range of expression that has long been held to be within the protections of the First and Fourteenth Amendments. Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee. Nor may an entertainment program be prohibited solely because it displays the nude human figure. "[N]udity alone" does not place otherwise protected material outside the mantle of the First Amendment. Furthermore, as the state courts in this case recognized, nude dancing is not without its First Amendment protections from official regulation.
 
 
 198
 Whatever First Amendment protection should be extended to nude dancing, live or on film, however, the Mount Ephraim ordinance prohibits all live entertainment in the Borough: no property in the Borough may be principally used for the commercial production of plays, concerts, musicals, dance, or any other form of live entertainment. Because appellants' claims are rooted in the First Amendment, they are entitled to rely on the impact of the ordinance on the expressive activities of others as well as their own.
 
 
 199
 452 U.S. at 65-66, 101 S.Ct. at 2180-2181 (citations and footnote omitted). Culling this passage and adding ellipsis can produce phrases such as "nude dancing ... [is] rooted in the First Amendment", but this is not the Court's point. It tells us that a "wide range of expression " is protected, and that " '[n]udity alone' does not place otherwise protected material outside the mantle of the First Amendment". Conduct gets to be "otherwise protected", however, by having an element of "expression". So nudity at the end of Hair does not withdraw the protection for the political expression that dominates that play, Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). Nudity in a ballet expressing ideas would not remove it from the realm of speech. These principles do not aid the plaintiffs today, however, for they have not established that they are engaged in "expression".
 
 
 200
 Cases such as Doran v. Salem Inn, Inc., 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975), are no more helpful: "[a]lthough the customary 'barroom' type of nude dancing may involve only the barest minimum of protected expression, ... this form of entertainment might be entitled to First and Fourteenth Amendment protection under some circumstances." (Citation omitted, emphasis added.) Under what circumstances? When it communicates something, I should think. FW/PBS, Inc. v. Dallas, --- U.S. ----, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), is even less aid to the plaintiffs, for there the city conceded that nude dancing is speech, and "[i]t is [the] Court's practice to decline to review those issues neither pressed nor passed upon" in the court of appeals. Id. at 604.
 
 
 201
 To the extent Schad and Doran offer guidance, the Court's resort to overbreadth analysis implies that nude dancing is not always clothed with expression. Overbreadth is a special doctrine entitling someone whose words or deeds could be regulated or even proscribed to prevail on the ground that as applied to someone else the law prohibits protected speech. Schad offered live nude dancing to his patrons. If nude dancing is expression, or if all entertainment is protected speech, it would have been simple to say: "Schad offers entertainment, which the borough forbids; therefore the law is unconstitutional." Instead the Court said that "[w]hatever First Amendment protection should be extended to nude dancing", Schad's "claims" (not the nudity) were sufficiently rooted in the First Amendment that he could contest the application of the ordinance to "the expressive activities of others". Only three weeks later, Justice Stevens remarked that although the Court has "written several opinions implying that nude or partially nude dancing is a form of expressive activity protected by the First Amendment, the Court has never directly confronted the question". New York State Liquor Authority v. Bellanca, 452 U.S. 714, 718-19, 101 S.Ct. 2599, 2602, 60 L.Ed.2d 357 (1981) (dissenting opinion). Justice White, the author of Schad, concluded four years ago that the status of nude dancing remains unsettled. Young v. Arkansas, 474 U.S. 1070, 1072, 106 S.Ct. 830, 832, 88 L.Ed.2d 801 (1986) (dissenting from the denial of certiorari). Nothing since then changes that assessment.
 
 
 202
 Dallas v. Stanglin, --- U.S. ----, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989), comes closest to our problem. It holds that social dancing is not "expressive activity ... protected by the First Amendment." How is nude barroom dancing different from social ballroom dancing? The court does not say; it does not mention Stanglin. The concurring opinion suggests (op. 1092) that the difference lies in performance: social dancing is like "casual chit-chat", not the kind of "statement" that the First Amendment protects. The majority does not embrace this, for good reason. The sole case on which the concurring opinion relies arises out of public employment. Employees who go to work for the government surrender rights to speak to the extent necessary to allow the government to function. E.g., CSC v. Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); Snepp v. United States, 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980). Even in the public employee cases an audience is not essential to constitutional protection. Rankin v. McPherson, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). See also, e.g., Norwell v. Cincinnati, 414 U.S. 14, 94 S.Ct. 187, 38 L.Ed.2d 170 (1973) (insulting language to a police officer's face). Congress could not imprison anyone on account of words of endearment whispered in the ear of a loved one. If privacy of speech does not blot out the First Amendment, then the difference between the brazen display of barroom dancing and the subdued display of ballroom dancing cannot reconcile this case with Stanglin. Perhaps, then, the concurring view depends on the principle that "low value" speech of all kinds is unprotected. Yet what keeps nude barroom dancing out of that category?
 
 
 203
 A line that distinguishes barroom dancing (protected) from ballroom dancing (unprotected) has little virtue other than avoiding inconvenient precedent such as Stanglin. If the "expression" in barroom dancing lies, as my colleagues believe, maj. op. 1086-87, in a celebration of sex, conveying the pleasure dancers take in sensuality, social dancing is the more expressive. Barroom dancers feign emotion; ballroom dancers express the real thing. So if precedent is what drives our court today, the most powerful case is Stanglin, which undermines the majority's conclusion.
 
 E
 
 204
 Speech versus conduct is not only the First Amendment's line but also a distinction essential to democratic governance. People act for reasons. Acts therefore imply the virtue or import of these reasons. And if some people, such as the dancers in JR's Kitty Kat Lounge, believe that their autonomic nervous systems are in charge, so that they have no message, Sigmund Freud will correct them. Even in a quantum-mechanical universe there are reasons, and clever observers can infer messages having nothing to do with the id and the superego. A driver doing 90 in a school zone makes an implicit proposal to change the speeding laws, or comments on the dominance of man over machine, or declaims the low value of children's lives, or advertises the capabilities of the car. So too we attribute to nude dancing a belief in the value of Eros, or a retelling of the Genesis story, or a burst of lustful emotion. If that strains credulity we may consult the books. Persons wanted to sleep in the national parks in CCNV to show that the high price of housing bred homelessness; strippers protest the high cost of clothing.
 
 
 205
 This is clever invention, too clever for constitutional adjudication. Neither the dancers nor their lawyers came up with a message in five years of litigation. That well-read judges can tease out of dancers' acts thoughts the dancers never had, and divine in a rule requiring opaque covering of the nipples a threat to the display of Aubrey Beardsley's prints, shows the importance of drawing lines rather than the need to obliterate them. "It is possible to find some kernel of expression in almost every activity a person undertakes ... but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." Stanglin, 109 S.Ct. at 1595.
 
 
 206
 Transmogrifying conduct into speech thrusts courts into the business of substantive due process. For if entertainment is speech, then it is subject only to "reasonable time, place, and manner restrictions". "Reasonable" is the key word. Legislatures bear the burden of showing that the regulation is reasonable. What is "reasonable", except what is wise? Assessing the wisdom of legislation is the program of Lochner. It failed when applied to wages and hours laws and is no more suited to nude dancing. "Reasonableness" is not a standard, not law at all. John Hart Ely, Democracy and Distrust 111-16 (1980); T. Alexander Aleinikoff, Constitutional Law in an Age of Balancing, 96 Yale L.J. 943, 966-68, 976-79, 984-95 (1987). When courts assess the "reasonableness" of legislation, they and not the elected legislators are the real policy-makers.
 
 
 207
 Preserving the spheres of judicial and political decision is not "to abdicate or avoid [judicial] responsibility", maj. op. 1085 n. 4. You can't "abdicate" a power you do not possess. When deciding whether judicial power exists a court must recognize the importance of preserving distinctive political and judicial roles. If nude dancing is "speech" it is so by the barest margin; someone standing at the center of the First Amendment (political speech) would need binoculars to see this far into the periphery. Judges should not establish rules that "disserve[ ] principles of democratic self-governance", Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 547, 105 S.Ct. 1005, 1015, 83 L.Ed.2d 1016 (1985). "Values that are protected against governmental interference through enshrinement in the Bill of Rights are not thereby banished from the political process", Employment Division v. Smith, --- U.S. at ----, 110 S.Ct. at 1606, and judges must respect the boundary between that process and the domain of law. Concern about the limits of judicial power, about the authority for an official with life tenure to countermand a decision of the elected legislature, must be at the forefront in every constitutional case. Article III does not commit to federal courts the resolution of all questions about the wisdom of rules. Allen v. Wright, 468 U.S. 737, 750-53, 104 S.Ct. 3315, 3324-26, 82 L.Ed.2d 556 (1984); Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 865-66, 104 S.Ct. 2778, 2788-93, 81 L.Ed.2d 694 (1984); Vance v. Bradley, 440 U.S. 93, 110-11, 99 S.Ct. 939, 949-50, 59 L.Ed.2d 171 (1979); TVA v. Hill, 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978). Yet it is exactly that power we claim in first treating conduct as "speech" and then saying that only "reasonable" regulation is allowed. The First Amendment is designed to get government out of the business of regulating speech while preserving to legislators freedom to act with respect to other human affairs. The court's two-step, by contrast, treats conduct as speech yet asserts a broad power to regulate speech ("reasonably", of course) and means that fundamental decisions about legislation of all kinds vest in the judiciary.
 
 
 208
 Judges avoid this by insisting on categorical rules. "Conduct" and "speech" are the principal categories, and observing that distinction is essential if we wish to maintain the boundary between legislative and judicial roles in a democratic society. Any sentient being knows that categories are imperfect. Lawyers are trained to disparage line-drawing by showing that no matter where the line goes you can frame essentially indistinguishable cases on either side. Such a line is nonsensical!, comes the coupe de grace. The exercise is child's play in the domain of art and entertainment, for "what is art?" is a question unanswered for centuries. Albrecht Duver and a vandal wielding a can of spray paint have some things (paint, surfaces, emotions) in common. Yet the extremes are distinctive, and the difference permits a line even though other cases are much closer. Cf. United States v. Powell, 423 U.S. 87, 93, 96 S.Ct. 316, 320, 46 L.Ed.2d 228 (1975).
 
 
 209
 Political society depends on stable lines to govern a world of continuums. Anything else transfers the locus of power. Judges who see the many facets of a subject, who know that just as a line cannot bisect a sphere so no one-dimensional rule can partition a multi-dimensional world, also must understand the role lines play in governance and the allocation of functions. Complex reality mocks rules, yet we must deny ourselves the comfort of requiring the law to match the universe. Holmes understood this. Klein v. Board of Tax Supervisors, 282 U.S. 19, 23, 51 S.Ct. 15, 15-16, 75 L.Ed. 140 (1930); Hudson County Water Co. v. McCarter, 209 U.S. 349, 355, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908). An era of balancing has obscured this message, but it is no less important today. See Employment Division v. Smith, --- U.S. at ---- n. 5, 110 S.Ct. at 1606 n. 5: it is "horrible to contemplate that federal judges will regularly balance against the importance of general laws the significance of religious practice"--or, I should think, the significance of nudity to a dance.
 
 III
 
 210
 If go-go dancing were "expression", and if dancers regularly undressed during the bacchanal in the third act of Saint-Saens' Samson et Dalila without objection from Indiana, we would have an interesting case. So far as this record reveals, however, there is neither expression nor unequal enforcement according to viewpoint. An officer told the judge that he had never arrested a ballet dancer for nudity, but nothing in the record suggests that ballet dancers pirouette without tutus in his jurisdiction.
 
 
 211
 Statutes may express moral views about how the community should live. See Bowers v. Hardwick, 478 U.S. 186, 196, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986); Paris Adult Theatre I, 413 U.S. at 57-63, 93 S.Ct. at 2635-38; Dronenburg v. Zech, 741 F.2d 1388, 1397 (D.C.Cir.1984) (Bork, J.). Much law is based on nothing other than moral views. Sometimes morality combines with instrumental concerns. We accepted as adequate to support legislation the belief that displaying women in a sexually submissive way shapes social patterns to women's detriment. Hudnut, 771 F.2d at 328-30. This court held Indianapolis's ordinance unconstitutional only because it distinguished on account of the speaker's viewpoint. Many of the justifications advanced for the Indianapolis ordinance could be offered for restrictions on displays in pubs. Cf. Renton v. Playtime Theatres, Inc., 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). Because the public nudity law does not discriminate on account of viewpoint, it does not have the defect that lead to invalidity in Hudnut.
 
 
 212
 Maybe all of this is rationalization of a law that has no effects beyond depriving hoi polloi of a harmless pastime. Maybe not. Ours is not the decision. States may offer different social climates from which the people may select. Indiana has one, Illinois another. Society is the richer when choices increase.
 
 
 213
 Darlene Miller wants to impress the barflies so they will ply her with drinks. She believes that the impression made by her act varies inversely with the amount of clothing she wears. She is the best judge of her self-interest, but this has nothing to do with the First Amendment. We may doubt the wisdom of requiring women to wear more clothing in the bars of South Bend than in the Folies Bergere or on the beaches of Rio de Janeiro without concluding that Indiana has exceeded its powers under the Constitution.
 
 
 214
 MANION, Circuit Judge, with whom COFFEY and EASTERBROOK, Circuit Judges, join, dissenting.
 
 
 215
 Today this court holds that "freedom of speech" protects public, nonverbal, nude dancing that communicates no ideas and is considered harmful. Not surprisingly, in their briefs and at oral argument the parties never discussed the text of the First Amendment. Perhaps this is because everyone knows that "Congress shall make no law ... abridging the freedom of speech"; more likely, it is because reference to the text is a stark reminder of how far First Amendment jurisprudence has gone astray.
 
 
 216
 Miller should not prevail for two reasons. First, the district court found that the nude dancing at issue contained no "expressive activity." At oral argument Miller's attorney admitted that this dancing communicated no idea or message. The district court's finding was not clearly erroneous, and we should affirm on that basis.[1]
 
 
 217
 Second, assuming for the sake of argument that striptease contains an expressive element, this statute is valid because the state interest in preventing public nudity--an interest unrelated to the suppression of speech--outweighs whatever expressive elements are contained in a striptease. The majority, by its emphasis on dance, disregards the fact that the challenged statute is not directed at dance but at public indecency, including "appear[ing] in a state of nudity" in a public place. Public nudity is conduct, and is prohibited in every state. Striptease dancers who remove all their clothing become nude in public, and their conduct violates the statute.[2] The Supreme Court has upheld other content-neutral regulations even though the speech in those cases was much closer to the core of First Amendment protected activity than nude dancing. See U.S. v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (political protest to the military draft); Clark v. Community for Creative Non-Violence, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (political protest relating to homelessness). Here the state's valid interest in preserving public morality justifies this statute despite its incidental impact on the "limited" First Amendment interests the majority believes are inherent in nude dancing. Majority op. at 1085.
 
 
 218
 The majority finds expression that not even Miller's counsel much less the district court could find. Majority op. at 1087. Although we must not ignore original meaning when applying constitutional provisions, we nevertheless cannot turn back the evolutionary clock, powered by caselaw, that has enlarged the circle of protection of the First Amendment. But we still should consider original meaning if we are to avoid enlarging this circle even more.
 
 
 219
 In his concurrence, Judge Posner suggests that "original understanding as a guide to constitutional interpretation" changes the Constitution from a "living document" into a "petrified reminder of the limits of human foresight." Concurring op. at 1095. Fortunately, with great foresight the framers of the Constitution enacted Article V, which allows adequate "life support" through the amendment process. It takes little foresight to realize that three-fourths of state legislatures would not ratify a Twenty-seventh Amendment that stated "the right of citizens of the United States to entertain by dancing nude in public shall not be denied or abridged by the United States or by any state." It is a much simpler process for a handful of judges to protect nude dancing as entertainment by calling it speech.
 
 
 220
 Nothing in the Constitution prohibits public nudity. Modern legislatures make those decisions in response to the desires of the people. The Constitution grants broad power to legislatures in part because they are best able to respond to changing times and social mores. Legislatures are always free to create new liberties by repealing outdated legislation or passing new laws, and the Constitution has nothing to say about it.
 
 
 221
 Judge Posner observes that in 1990 America "the project of stamping out nude striptease dancing is quixotic. The power of government is relative to the desires and values of its people. The State of Indiana cannot take the erotic edge off American culture. I doubt that it is even trying to do so." Concurring op. at 1104. It should be apparent that the elected representatives of the people of Indiana are much better suited to determining "the desires and values" of their people than those of us who sit on this court. We must assume that if Indiana did not believe nude dancing was a problem, its public nudity statute would be repealed, or at least not used against nude barroom dancing.
 
 
 222
 This court's decision stands only for the proposition that we know better than the people of Indiana. Nude dancing ought to be legal, therefore it must be protected by the Constitution. At least Judge Posner's concurrence is straightforward:
 
 
 223
 Censorship of erotica is pretty ridiculous too. What kind of people make a career of checking to see whether the covering of a woman's nipples is fully opaque, as the statute requires? ... Many of us do not admire busybodies who want to bring the force of law down on the heads of adults whose harmless private pleasures the busybodies find revolting.
 
 
 224
 Concurring op. at 1100. While that may be true, legislative busybodies can be tossed out of office at the next election. We judges have lifetime insulation from such harsh realities. But since the question is raised, what power does a state have to regulate public morals: what motivates these "busybodies"? Perhaps we should begin where Judge Posner left off--"the power of government is relative to the desires and values of its people." Concurring op. at 1104.
 
 
 225
 Even when First Amendment interests are present the Supreme Court always has recognized the authority of the state to legislate in the interest of protecting community morals. And "as the mode of expression moves from the printed page to the commission of public acts that may themselves violate valid penal statutes, the scope of permissible state regulations significantly increases." California v. LaRue, 409 U.S. 109, 117, 93 S.Ct. 390, 396, 34 L.Ed.2d 342 (1972).
 
 
 226
 In Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942), when discussing the use of "fighting words," the Court held that some "utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." In the obscenity context, Chief Justice Warren wrote of "the right of the Nation and of the States to maintain a decent society ..." versus "the right of individuals to express themselves freely." Jacobellis v. Ohio, 378 U.S. 184, 199, 84 S.Ct. 1676, 1684, 12 L.Ed.2d 793 (1964) (Warren, Ch.J., dissenting); Justice Brennan in Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957) and Chief Justice Burger in Paris Adult Theatre v. Slaton, 413 U.S. 49, 61, 93 S.Ct. 2628, 2637, 37 L.Ed.2d 446 (1973), "implicitly accepted that a legislature could legitimately act ... to protect 'the social interest in order and morality.' " Paris Adult Theatre, id., citing Chaplinsky. The Paris Court went on to cite a statement of Justice Holmes, made in a different context:
 
 
 227
 [T]he proper course is to recognize that a state Legislature can do whatever it sees fit to do unless it is restrained by some express prohibition in the Constitution of the United States or of the State, and that Courts should be careful not to extend such prohibitions beyond their obvious meaning by reading into them conceptions of public policy that the particular Court may happen to entertain.
 
 
 228
 413 U.S. at 61, n. 11, 93 S.Ct. at 2637, n. 11, quoting Tyson & Brother v. Banton, 273 U.S. 418, 47 S.Ct. 426, 71 L.Ed. 718 (1927) (Holmes, J., dissenting).
 
 
 229
 Even if interest in public morality--concern for the moral welfare of dancers and patrons--were the only reason for this statute to be applied to nude dancing, that would be sufficient.[3] Certainly legislatures and prosecutors are entitled to consider the effect viewing striptease dances might have on the moral behavior of patrons,[4] including the potential for damaging marriages and breaking up families by fueling the desire for adultery.[5] In Bowers v. Hardwick, 478 U.S. 186, 196, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986), the plaintiff challenged Georgia's prohibition of sodomy in part because there was no basis for the law
 
 
 230
 other than the presumed belief of a majority of the electorate in Georgia that homosexual sodomy is immoral and unacceptable. This is said to be an inadequate rationale to support the law. The law, however, is constantly based on notions of morality, and if all laws representing essentially moral choices are to be invalidated under the Due Process Clause, the courts will be very busy indeed.
 
 
 231
 But there is more here than a concern for the morals of patrons who merely view nude dancing. In California v. LaRue, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), the Supreme Court upheld a prohibition on nude dancing in bars based on the regulatory powers granted states by the Twenty-first Amendment.[6] Here in Miller, the district court reviewed a videotape of Darlene Miller dancing nude--no customers were present, no one was being "entertained." LaRue takes us out of the abstract and into the real world where valid reasons for restricting certain conduct become obvious. Chief Justice Rehnquist described in rather graphic fashion the state's reason for prohibiting nude dancing in bars:
 
 
 232
 Customers were found engaging in oral copulation with women entertainers; customers engaged in public masturbation; and customers rolled currency either directly into the vagina of a female entertainer, or on the bar in order that she might pick it up herself. Numerous other forms of contact between the mouths of male customers and the vaginal areas of female performers were reported to have occurred.
 
 
 233
 Prostitution occurred in and around such licensed premises, and involved some of the female dancers. Indecent exposure to young girls, attempted rape, rape itself, and assaults on police officers took place on or immediately adjacent to such premises.
 
 
 234
 409 U.S. at 111, 93 S.Ct. at 393. Although Indiana does not compile a legislative history, it is entitled to rely on the experiences of other communities that have dealt with the problems associated with nude dancing. See Renton v. Playtime Theatres, Inc., 475 U.S. 41, 50-52, 106 S.Ct. 925, 930-931, 89 L.Ed.2d 29 (1986) (city of Renton was entitled to consider the evidence from other communities of the harmful effects of sexually oriented businesses when enacting its own zoning ordinance). Most communities and states that enact nude dancing regulations report problems similar to those described in California v. LaRue, along with other problems such as neighborhood blighting and decreased property values. See Attorney General's Commission on Pornography Final Report, Vol. I., at 385-389 (1986) (discussing the problems associated with sexually oriented businesses, including bars with live nude dancing). Judge Posner wonders whether the bar at issue in this case is in South Bend's red light district, and whether South Bend even has a red light district. Concurring op. at 1100. The answer to both questions seems to be yes, but the record is not conclusive. The record does indicate that several establishments that challenged the public nudity statute are clustered in the same area on South Michigan Street. A cursory finger-walk through the Yellow Pages (not in the record) would probably disclose similar places along with "adult" bookstores and video parlors. Perhaps a more detailed record (such as contained in LaRue or the Attorney General's report) would emphasize to us what the local people already know. But it should not matter. South Bend's experience cannot be unique; the sheer volume of legislation in this field makes that clear.[7] Indiana's decision to use its public nudity statute to prohibit public nude dancing in bars is justified.
 
 
 235
 The state has made a moral judgment about public nudity, and consistent with that decision seeks to apply that judgment to public nude dancing. The state has also made moral judgments about bullfighting, dogfighting, gambling and any number of other activities that probably involve some conception of entertainment and expression. If all of these activities are protected to a limited extent by the First Amendment,[8] this court's only justification for suppressing one and allowing the others must be that we agree with the state's decision to ban bullfighting, dogfighting and (some) gambling, but cannot understand why the state would want to prevent nude dancing. Nude dancing is not protected by a stated constitutional provision that a majority of people have subverted at the expense of a minority, requiring the petitioned court to intervene. Rather, this is a valid law which fulfills a perceived need. Determining the wisdom, need, or propriety of laws is the role of an elected legislature, not the federal judiciary. Griswold v. Connecticut, 381 U.S. 479, 481-82, 85 S.Ct. 1678, 1679-80, 14 L.Ed.2d 510 (1965).
 
 
 236
 To summarize, the majority's decision is not compelled by any holding or dicta of the Supreme Court. Neither is it compelled by any reasonable interpretation of the First Amendment. Indiana's prohibition of public nudity can apply to nude dancing that contains no expressive activity. The district court found and counsel for plaintiffs admitted that the dancing at issue does not express anything. Even if nude dancing is considered inherently expressive, Indiana may regulate the nude conduct through its content-neutral statute, because the governmental interest in preventing public indecency and immorality substantially outweighs whatever limited First Amendment rights are implicated by a simple striptease performed for money in bars. The judgment of the district court should be affirmed.
 
 
 
 [1]
 IND.CODE 35-45-4-1 provides in full:
 Public Indecency
 Section 1. (a) A person who knowingly or intentionally, in a public place:
 (1) engages in sexual intercourse;
 (2) engages in deviate sexual conduct;
 (3) appears in a state of nudity; or
 (4) fondles the genitals of himself or another person;
 commits public indecency, a Class A misdemeanor.
 (b) "Nudity" means the showing of the human male or female genitals, pubic area, or buttocks with less than opaque covering, the showing of the female breast with less than a fully opaque covering of any part of the nipple, or the showing of the covered male genitals in a discernibly turgid state.
 
 
 [2]
 Throughout this opinion, we use the general term "nude dancing" to refer specifically to non-obscene nude dancing of the bar-room variety performed as entertainment
 
 
 [3]
 In dissent, Judge Easterbrook charges us with taking the position that the Supreme Court has already affirmatively decided the issue presented today. We take no such position. To the contrary, we have simply analyzed the relevant Supreme Court and lower court pronouncements in this difficult and sensitive area of the law. As an intermediate federal court, we are obligated to interpret the present state of the law as well as envision what the Supreme Court would hold if directly presented with the issue
 
 
 [4]
 Judge Easterbrook's dissent argues that we should not attempt to discern the line between conduct and speech because doing so draws us into the province of the legislature. Dissent at 1129-30. It argues that by adhering to the broad categories of "speech" and "conduct" we can avoid this infringement. We respectfully suggest that doing so begs the question as to what is protected and what is not. We therefore decline the invitation to abdicate or avoid our responsibility to interpret the Constitution consonant with Supreme Court direction
 
 
 [5]
 To the extent that the district court found otherwise, we find that it was clearly erroneous. Contrary to the positions taken by Judges Coffey (dissent at 1116-17) and Easterbrook (dissent at 1123-24) in dissent, the parties' characterizations (or the lack thereof) of their artistic endeavours as expressive or nonexpressive, while possibly relevant, cannot be determinative nor binding upon this Court for first amendment purposes
 
 
 [6]
 The commentators have agreed with this interpretation of Schad. For a representative sampling, see: Stone et al., Constitutional Law 1167 (1986); Day, The Incidental Regulation Of Free Speech, 42 U. Miami L.Rev. 491 (1988); Rice, The Search For Valid Governmental Regulations: A Review Of The Judicial Response To Municipal Policies Regarding First Amendment Activities, 63 Notre Dame L.Rev. 561 (1988); Giokaris, Zoning And The First Amendment: A Municipality's Power To Control Adult Use Establishments, 55 UMKC L.Rev. 263 (1987); Note, The Role Of "Secondary Effects" In First Amendment Analysis: Renton v. Playtime Theatres, Inc., 22 U.S.F.L.Rev. 161 (1987); Poole, Architectural Appearance Review Regulations And The First Amendment: The Good, The Bad, And The Consensus Ugly, 19 Urb.Law. 287 (1987); Note, Trademark Parody: A Fair Use And First Amendment Analysis, 72 Va.L.Rev. 1079 (1986); Kellam & Lovelace, To Bare Or Not To Bare: The Constitutionality Of Local Ordinances Banning Nude Sunbathing, 20 U.Rich.L.Rev. 589 (1986); Rich & Brilliant, Defamation-In-Fiction: The Limited Viability of Alternative Causes of Action, 52 Brooklyn L.Rev. 1 (1986); Simon, The Authority Of The Framers Of The Constitution: Can Originalist Interpretation Be Justified?, 73 Calif.L.Rev. 1482 (1985); Yen, Judicial Review Of The Zoning Of Adult Entertainment: A Search For The Purposeful Suppression Of Protected Speech, 12 Pepperdine L.Rev. 651 (1985); Note, Freedom of Speech--Regulation Of Live Entertainment, 96 Harv.L.Rev. 231 (1981)
 
 
 [7]
 In his dissent, Judge Easterbrook contends that the statute is "unrelated to the suppression of free expression." Dissent at 1120. The stated purpose of the statute is the preservation of a particular set of views; those reflecting the Indiana legislature's view of "public morality." In meeting this intended goal, the statute directly restricts activity in the context of this case precisely because it expresses a particular message contrary to the legislature's prescribed vision. As such, it is directly related to the suppression of free expression
 
 
 [1]
 I hasten to add, however, that I do not think it appropriate to make fine distinctions between the favored entertainments of "Joe Sixpack" and those of "Mrs. Gotrocks." As the majority notes, the Free Speech Clause, by protecting the freedom of expression, necessarily leaves matters of expression and style to the individual
 
 
 [2]
 E.g., "Take it off; take it all off!"
 
 
 [3]
 No doubt, however, such messages--sent according to the style of the day--were known to the Framers
 
 
 [1]
 Bowers, 478 U.S. at 205, 106 S.Ct. at 2851 (Blackmun, J., dissenting), quoting Roberts v. United States Jaycees, 468 U.S. 609, 619, 104 S.Ct. 3244, 3250, 82 L.Ed.2d 462 (1984)
 
 
 [2]
 In Osborne the Court believed this measure was necessary "because much of the child pornography market has been driven underground; as a result, it is difficult, if not impossible, to solve the child pornography problem by only attacking production and distribution." --- U.S. at ----, 110 S.Ct. at 1695. The Court also noted that "[i]t is ... surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand." Id
 
 
 [3]
 Hardwick severely undercuts the persuasive authority of the Eleventh Circuit's decision in Krueger v. City of Pensacola, 759 F.2d 851, 855-56 (11th Cir.1985), cited in Judge Posner's concurrence. See Posner concurrence at 1104. Krueger predated Hardwick, was decided by the same court of appeals whose judgment was reversed in Hardwick, and its rationale that traditional moral concepts cannot provide a legitimate basis for state legislation is certainly inconsistent with the respect for such concepts the Supreme Court expressed in Hardwick
 
 
 [4]
 Attorney General's Commission on Pornography, U.S. Department of Justice, Final Report 331-32 (1986) (emphasis added). The Attorney General's Commission went on to note that:
 "Although the category of the degrading is one that has only recently been isolated in some research, in the literature generally, and in public discussion of the issue, it is not a small category. If anything, it constitutes somewhere between the predominant and the overwhelming proportion of what is currently standard fare heterosexual pornography, and is a significant theme in a broader range of materials not commonly taken to be sexually explicit enough to be pornographic. But as with sexually violent materials, the extent of the effect of these degrading materials may not turn substantially on the amount of sexual explicitness once a threshold of undeniable sexual content is surpassed. The category therefore includes a great deal of what would not be considered to be pornographic, and includes a great deal of what would now be held to be legally obscene, but includes much more than that."
 Id. at 334-35.
 
 
 [5]
 Osborne v. Ohio, --- U.S. ----, ----, 110 S.Ct. 1691, 1695, 109 L.Ed.2d 98 (1990)
 
 
 [6]
 In addition, the prostitution activity that so often accompanies nude dancing most assuredly provides a basis for the infiltration of organized crime into a community. For example, the Attorney General's Commission on Pornography noted: "Michael Joseph Glitta, one of the two major pornography distributors in Chicago, and a lieutenant in the Accardo organized crime family, controlled a 'strip joint' where numerous persons have been arrested for prostitution-related offenses." Attorney General's Commission on Pornography, U.S. Department of Justice, Final Report 1059 (1986)
 
 
 [7]
 Obviously if a dance was part of a graduate Ph.D. thesis, it would be accompanied by written argument (reasoning) explaining the ideas the dance conveyed, thus coming within the parameters of the First Amendment (expression). The expression involved in that situation contrasts sharply with our case where the dancers have, in my opinion, neither exhibited nor contended that their activities were intended to express any idea at all. See p. 1116, infra
 
 
 [8]
 Applying "as applied" analysis, it would appear arguable that J.R.'s Kitty Kat Lounge and the dancers who appear there have no constitutional claim because their conduct was constitutionally unprotected since they attempted to conduct their nude dancing in a state-licensed bar serving alcoholic beverages in which nude dancing could be completely banned under the twenty-first amendment. See City of Newport v. Iacobucci, 479 U.S. 92, 95, 107 S.Ct. 383, 385, 93 L.Ed.2d 334 (1986) (per curiam) (State "regulatory authority [under the Twenty-First Amendment] includes the power to ban nude dancing as part of a liquor license control program"). It is unnecessary to consider this possibility, however, because the Indiana public nudity statute can legitimately ban the nude dancing of all of the plaintiffs
 
 
 [9]
 This result is not surprising in light of the Supreme Court's recognition that the "standard of United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), for validating a regulation of expressive conduct, ... in the last analysis is little, if any, different from the standard applied to time, place, or manner restrictions." Clark v. Community for Creative Non-Violence, 468 U.S. 288, 298, 104 S.Ct. 3065, 3071, 82 L.Ed.2d 221 (1984)
 
 
 [10]
 Both Iacobucci and Bellanca were cases in which the Supreme Court recognized under the Twenty-First Amendment to the Constitution a broad state power to control nude dancing in establishments that served alcohol
 
 
 [11]
 In Clark v. Community for Creative Non-Violence, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), the Supreme Court rejected a group of protesters' position that a governmental camping ban violated the First Amendment because it interfered with the expression that the protesters contended was present in their overnight residence in a symbolic tent city. The Supreme Court observed: "That sleeping, like the symbolic tents themselves, may be expressive and part of the message delivered by the demonstration does not make the ban [on overnight camping] any less a limitation on the manner of demonstrating, for reasonable time, place, or manner regulations normally have the purpose and direct effect of limiting expression but are nevertheless valid." Clark v. Community for Creative Non-Violence, 468 U.S. 288, 294, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)
 
 
 [12]
 As Judge Posner stated in Kucharek v. Hanaway, 902 F.2d 513, 520 (7th Cir.1990):
 "No doubt it rather depreciates Wisconsin's commitment to extirpating obscenity to create an exemption of this sort; for imagine the hue and cry if Wisconsin exempted officials and employees of schools and public libraries from criminal liability for prostitution or rape. But this is a state that got along for eight years with no obscenity statute at all: the American Denmark. There are degrees of perceived criminal gravity, and apparently in Wisconsin obscenity is of not much more than zero degree. But Wisconsin can make its own judgment about the seriousness of obscenity as a social problem responsive to criminal punishment without encountering problems under the equal protection clause, and it ill becomes pornographers to complain about the leniency of an obscenity statute."
 
 
 [13]
 Majority Opinion at 1086
 
 
 [14]
 See generally Posner concurrence at 1101
 
 
 [1]
 This is not at odds with Supreme Court precedent. The Supreme Court specifically has declined to rule on the scope of First Amendment protection to be afforded nude dancing. See Young v. Arkansas, 474 U.S. 1070, 1072, 106 S.Ct. 830, 832, 88 L.Ed.2d 801 (1986) (White, J., dissenting from the denial of certiorari). In California v. LaRue, 409 U.S. 109, 117-18, 93 S.Ct. 390, 396-97, 34 L.Ed.2d 342 (1972), the Court made clear that conduct such as nude dancing is protected by the First Amendment only when there is a "communicative element," citing U.S. v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). See dissenting opinion of Judge Easterbrook at 1127-29
 
 
 [2]
 Public nudity statutes--"indecent exposure" laws--of the type challenged here are widely accepted and usually upheld, even when the challenge is grounded in the First Amendment. See South Florida Free Beaches v. City of Miami, 734 F.2d 608 (11th Cir.1984) (nude sunbathers' argument that state law and city ordinances prohibiting public nudity violated their First Amendment right to demonstrate that "the human body is wholesome and that nudity is not indecent" rejected because the First Amendment does not protect nudity unless combined with some "mode of expression" entitled to First Amendment protection); Williams v. Kleppe, 539 F.2d 803 (1st Cir.1976) (nude sunbathing in a national park not protected); Craft v. Hodel, 683 F.Supp. 289 (D.Mass.1988) (women who bared breasts in a political protest of alleged unequal treatment and exploitation of women not protected by First Amendment); Chapin v. Town of Southampton, 457 F.Supp. 1170 (E.D.N.Y.1978) (no First Amendment protection for nude sunbathers who sought to communicate ideas); Alexander v. Severson, 408 N.W.2d 195 (Minn.App.1987) (owner of adult bookstore featuring "exotic dancers" not entitled to injunction to prevent City of Minneapolis from enforcing its indecent conduct ordinance against dancers because no testimony "suggested an attempt to convey ideas" in the dancing); State v. Turner, 382 N.W.2d 252 (Minn.App.1986) (nude sunbathing)
 
 
 [3]
 We agree with and join Judge Easterbrook's discussion of the majority's attempt to portray this statute as one aimed at nude dancing, rather than as a content-neutral public nudity statute. Nevertheless, because Indiana applies this statute to nude dancing, and that application bothers the majority, we shall examine reasons states and subdivisions of states desire to regulate or prohibit nude entertainment. We do this to emphasize that even if this statute were aimed specifically at nude dancing, the state's valid interest in preserving public morality justifies the statute
 
 
 [4]
 The majority notes that "[d]ance also has biblical roots." Majority op. at 1085. While the biblical dancing cited was clearly not of the nude variety, we should point out that the Bible condemned as immoral the behavior Indiana sought to limit here. See Matthew 5:27-28. Fortunately we need only interpret the Constitution
 
 
 [5]
 See generally Attorney General's Commission on Pornography Final Report, Vol. I, at 767-1036 (1986) (discussing the impact of public sexual behavior on pornographic "models" and consumers of pornography, along with the connection between pornography, prostitution, and establishments offering nude dancing)
 
 
 [6]
 This court's opinion should be unanimous at least with respect to appellant Miller's dancing at J.R.'s Kitty Kat Lounge. The majority acknowledges that the Indiana statute is not overbroad; this case only involves the specific dances of each appellant. Indiana without question can ban nude dancing in establishments that serve alcohol. Majority op. at 1083. Therefore, this statute as applied to ban Miller's dancing in a bar that sells alcohol is not unconstitutional. See dissenting opinion of Judge Coffey at 1115, n. 8
 
 
 [7]
 Indeed, this court need only examine its own prior decisions to discover connections between nude dancing establishments and crime, especially prostitution. See United States v. Marren, 890 F.2d 924 (7th Cir.1989); United States v. Doerr, 886 F.2d 944 (7th Cir.1989); United States v. Muskovsky, 863 F.2d 1319 (7th Cir.1988)
 
 
 [8]
 Judge Posner admits that bullfighting, although completely banned in every state, is as much "expressive entertainment" as nude dancing: "Bullfighting is forbidden not because it is not expressive, but because in American society its harmful consequences are thought to outweigh its expressive value." Concurring op. at 1097